**Hugh HENRY, Petitioner,**

v.

**Charles J. SCULLY, Superintendent, Green Haven Corr. Facility, and Robert Abrams, Attorney General, State of New York, Respondents.**

**No. 91 CIV. 7632.**

United States District Court,
S.D. New York.

July 14, 1995.

---

698

Mark B. Gombiner, The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York City, for petitioner.

Monica R. Jacobson, Assistant Attorney General, State of New York Law Department, New York City, for respondents.

## OPINION & ORDER

KIMBA M. WOOD, District Judge.

Hugh Henry petitioned this court for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254 on November 12, 1991, and on November 29, 1991, the petition was referred to Magistrate Judge Gershon for a Report and Recommendation ("Report"). On April 25, 1995, the Magistrate Judge issued the attached Report, recommending that I grant the petition. Counsel for respondent timely filed objections to the Report, and petitioner filed a brief response to respondents' objections. Having undertaken a *de novo* review of the Report and of respondents' objections, I adopt Magistrate Judge Gershon's thorough and well-reasoned Report.

## I. Discussion

Although petitioner raised several claims of constitutional error, the Magistrate Judge accepted only one: that the performance of petitioner's attorney at trial violated petitioner's Sixth Amendment right to effective assistance of counsel. In particular, the Magistrate Judge found deficient the attorney's failure to object to the admission into evidence against petitioner of his co-defendant's confession, and his subsequent failure either to object to the prosecutor's reliance on this statement in his summation, or to request a limiting instruction as to the jury's use of the co-defendant's statement against petitioner. (Report at 37–38).[1]

 While there is no *per se* rule that this particular type of trial error—that is, the failure to contend adequately with incriminating statements made by a co-defendant—automatically constitutes an error of constitutional magnitude, a review of the record in this case shows that counsel's failure both fell below an objective standard of reasonableness, and prejudiced the petitioner's defense such that there is a reasonable probability the outcome would have differed in the absence of the unprofessional error. *See Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S.Ct. 2574, 2582–83, 91 L.Ed.2d 305 (1986) (citing *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984)).

1. Indeed, the trial judge instructed the jurors explicitly (and without any objection from petitioner's attorney) that if they believed that petitioner's co-defendant's statement was made to the police voluntarily, then that statement "could be used in determining the guilt or lack of guilt of these defendants. . . ." (Tr. at 776).

With respect to the "objective incompetence" prong, I note that although the Supreme Court has cautioned that "judicial scrutiny of counsel's performance must be highly deferential," *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064–65, Magistrate Judge Gershon properly found it impossible to conclude that petitioner's counsel's omissions in this case were merely tactical decisions, given that the co-defendant's hearsay statement implicating petitioner, if believed by the jury, was devastating to petitioner's claim of innocence. The oversights were particularly prejudicial when compounded with other egregious errors made by counsel, including his failure to object to hearsay testimony offered by Detective Palmieri (Tr. at 192), and his failure to request a missing witness charge regarding the absence of the confidential informant at trial. (Report at 43.)

With respect to the prejudice prong, I agree with the Magistrate Judge that the admission of the co-defendant's statement was disastrous to petitioner's defense: it provided highly prejudicial evidence, that, contrary to petitioner's claim, he and his co-defendant *were* acquainted, and that petitioner was in the vicinity of the "buy and bust" operation not for innocent reasons, but rather, because he was actively involved in the sale of narcotics. (Tr. at 487–88). *See generally Bruton v. United States,* 391 U.S. 123, 136, 88 S.Ct. 1620, 1628, 20 L.Ed.2d 476 (1968) (describing in detail prejudice suffered by defendant when co-defendant's testimony is admitted against defendant at joint trial).

## II. Conclusion

Because I agree with Magistrate Judge Gershon that petitioner has shown both that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, *see Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068, I find that petitioner has established a constitutional claim for ineffective assistance of counsel. Accordingly, I adopt the Magistrate Judge's Report in full, and order petitioner's writ of habeas corpus granted. Respondent

is directed either to release petitioner from custody, or to retry him within ninety days of this order.

SO ORDERED.

## *REPORT AND RECOMMENDATION*

GERSHON, United States Magistrate Judge:

Hugh Henry seeks, by this petition for a writ of habeas corpus under 28 U.S.C. § 2254, an order vacating a judgment of conviction imposed on July 28, 1981, after a jury trial, by the Supreme Court of the State of New York, New York County (Alexander, J.), for one count of the sale of a controlled substance, first degree, and one count of possession of a controlled substance, first degree, in violation of New York Penal Law §§ 220.43 and 220.21. His co-defendant, Conrad Taylor, was convicted of the same charges. Both were sentenced to concurrent prison terms of from 15 years to life.

## *PROCEDURAL BACKGROUND*

Petitioner appealed his conviction, and, on May 19, 1983, the Appellate Division, First Department, unanimously affirmed petitioner's conviction without opinion. 94 A.D.2d 983, 463 N.Y.S.2d 665 (1st Dept.1983). Leave to appeal to the Court of Appeals was denied on June 24, 1983. 59 N.Y.2d 973, 466 N.Y.S.2d 1034, 453 N.E.2d 558 (1983). Reconsideration was denied by Order dated November 9, 1983. 60 N.Y.2d 967, 471 N.Y.S.2d 1034, 459 N.E.2d 200 (1983). Henry apparently filed a *pro se* motion to vacate the judgment in 1983. (While Henry, on this petition, claims he never filed such a motion, he acknowledged that he had done so in a letter dated August 5, 1985, requesting the rehearing of the denial of his 1985 motion, described below).

In 1985, petitioner moved under Section 440.10 of the New York Criminal Procedure Law ("CPL") to set aside his conviction. By Order dated July 22, 1985, Justice Brenda Soloff denied this motion both on a procedural ground and on the ground that petitioner's claims were meritless.[1] Leave to reargue

---

1. The procedural ground upon which Justice So-

loff relied was that Henry had filed a *pro se*

was denied by Order dated August 20, 1985. Leave to appeal to the Appellate Division was denied by Order dated November 19, 1985. No. M–5539, (1st Dept. Nov. 19, 1985).

In 1990, petitioner filed a petition for a writ of error *coram nobis*, claiming that appellate counsel had been ineffective in arguing the ineffectiveness of petitioner's trial counsel. This petition was denied by the Appellate Division by Order dated May 3, 1990. No. M–593, 1990 N.Y.App.Div. LEXIS 5178 (1st Dept. May 3, 1990).

Petitioner then filed a motion to vacate his conviction pursuant to Section 440.10, arguing that he was denied effective assistance of counsel. This motion was denied by Justice George F. Roberts in an Order dated June 11, 1990, which cites as the bases for denial Section 440.10(2)(a) (issue previously determined on the merits on direct appeal) and 440.10(3)(b) (issue previously determined on the merits upon a prior motion or proceeding other than an appeal). That is, Justice Roberts, in 1990, concluded that the motion before him was procedurally barred, on the ground that Henry's claims had previously been decided on the merits. Leave to appeal to the Appellate Division, was denied by Order dated October 9, 1990. No. M–4205, 1990 N.Y.App.Div. LEXIS 11868 (1st Dept. Oct. 9, 1990).

### EXHAUSTION

■ The federal habeas corpus statute, 28 U.S.C. § 2254, requires that a state prisoner seeking federal review of his conviction first exhaust his available state remedies. A petitioner must have "fairly presented" his federal claim to the highest state court from which a decision can be had. *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d

438 (1971); *see Daye v. Attorney General of the State of New York*, 696 F.2d 186, 190 n. 3 (2d Cir.1982) (en banc). That is, he must have set forth in the state courts all the essential factual allegations he relies upon in this court, (*Daye*, 696 F.2d at 191–92), and he must have set forth in the state courts the federal constitutional legal theories upon which he relies in this court. *Duncan v. Henry*, —— U.S. ——, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995).

Respondent concedes that petitioner's claims have been exhausted. Independent review of each of the claims made here reveals that Henry has presented the identical claims, in the same federal constitutional terms, to the New York courts, either on direct appeal or on one of his collateral challenges to the conviction.

### SUMMARY OF EVIDENCE AT TRIAL

#### The People's Case

The People called six witnesses: New York City Police Detective Salvatore Palmieri, Police Officer Richard Ford, Police Officer Santiago Martinez, Police Officer Robert Lamirata, Police Chemist Richard D. Karasiewski, and Special Agent Donald Abrams of the Drug Enforcement Administration ("DEA").

Detective Palmieri testified that, on March 24, 1980, after receiving a telephone call from a confidential informant, he set up an undercover "buy and bust" operation. The undercover team with whom Palmieri planned the operation consisted of Detective Lamirata, Special Agent Donald Abrams, Police Officer Richard Ford, Special Agent Joseph Braddock, and Special Agent Thomas Fekete. The informant met with the team on March

Section 440.10 motion in 1983, that it had been denied by Justice Robert Haft on August 17, 1983, and "there is no indication in the present motion and affirmation of a reason why defendant would not have been in a position in that first motion to adequately raise the grounds and issues underlying the present motion." Soloff Opin. p. 1. However, the affirmation of the Assistant District Attorney opposing the motion before Justice Soloff stated that the 1983 motion "did not result in a decision" (Irizarry Afft. ¶ 10), and neither the supposed decision of Justice Haft nor any of the underlying 1983 motion papers

have been submitted by the respondent to this Court despite the requirement of the Rule 4 Order that the documents from all prior proceedings be submitted. The record also reflects that efforts by Henry to obtain a copy of the decision on the 1983 motion were unsuccessful, and a New York State Supreme Court Clerk advised Henry in a letter dated July 30, 1985, that "there is no copy of the District Attorney's Opposition [to the 1983 motion] in [the] file." It may be that Justice Soloff relied upon a state court worksheet containing a handwritten notation "denied" next to the recitation of the 1983 motion.

24, 1980, at approximately 5:30 p.m. "Buy" money in the amount of $20,000 was provided. At 6:30 p.m., the team members left Palmieri's office, Palmieri and the informant in one car, and the other team members in other cars. Palmieri and the informant arrived at 116th Street between Lenox and Fifth Avenues at approximately 7:00 p.m.

After waiting a few minutes, the informant got out of Detective Palmieri's car and called to an individual across 116th Street. Detective Palmieri testified that, subsequently, three individuals, later identified as petitioner, co-defendant Conrad Taylor and Steven Samm, approached Detective Palmieri's car. Taylor got into the front seat of the car and the informant introduced him to Palmieri. Samm and petitioner stood on the sidewalk approximately 25 feet ahead of Palmieri's car. Palmieri inquired of Taylor as to whether he was ready "to do the deal." T.[2] 116. Taylor replied in the affirmative, but insisted on first seeing Palmieri's money. Palmieri then went to the trunk of the car and returned with the $20,000 he had obtained for this purpose and showed the money to Taylor. While this transpired, petitioner "was with another individual on the sidewalk, not too far away from the car." T. 117.

After showing the money to Taylor, and once Taylor agreed to do the deal, Palmieri returned the money to the trunk of the car, promising to get the money again only when Taylor provided the heroin. Taylor requested that the deal be accomplished in a building, but Palmieri testified that he convinced Taylor to perform the deal in the car. At this point, Taylor left the car, saying that "he was going to get his man to deliver the package." T. 118. Taylor crossed 116th Street and was joined by petitioner, Samm and an unknown individual. The three got into a car on the other side of 116th Street. After a time, petitioner and Samm crossed back over 116th Street. Petitioner got into the back seat of Palmieri's car and "removed a clear plastic bag from a black gun case. He showed [Palmieri] a quantity of white powder." T. 119. Palmieri did not examine the package offered to him by petitioner at this 7 p.m. meeting, other than to visually observe that it contained a white powdery substance.

Palmieri then complained to petitioner that the deal to which he had agreed with Taylor involved a larger quantity of heroin. "After a short discussion," petitioner said, "'All right, just wait here.'" T. 120. Petitioner exited the car, taking the black case with him, and rejoined Taylor and Samm. Taylor then reentered the car and Palmieri told him that the deal called for a larger amount of heroin. Taylor said that he had to go to New Jersey, but promised that he could effect the deal as agreed at 10 p.m. that night. Taylor exited the car, and Palmieri and the informant drove off.

Palmieri testified that the informant and he returned to the same location on 116th Street that night at 10 p.m. Taylor, who was standing in front of a building at 51 West 116th Street, "called over for the informant to go over to him." T. 123. While Palmieri waited in the car, Taylor and the informant entered the building. Ten or fifteen minutes later, Taylor, the informant, petitioner and Samm emerged from the building. Palmieri was directed to move his car slightly closer to 51 West 116th Street. Taylor and the informant got into Palmieri's car. After a brief discussion, Taylor gave Palmieri a black gun case with six individually wrapped clear plastic bags containing white powder. At this point, petitioner "was right alongside the passenger side of the car," approximately three feet away from the car. T. 125.

Palmieri examined the white powder and, upon indicating that he found it acceptable, said that he would get the money. At that moment, a car pulled up in front of Palmieri's car. In the car were "two young men ... who appeared to be policemen." T. 127. As the men got out of their car, Taylor said, "'Cops, the men, the police.'" T. 149. He then grabbed the heroin from Palmieri's hands. Palmieri argued with Taylor to return the heroin, saying that he would get the money. Taylor nevertheless threw the heroin out the car window and onto the street. Petitioner picked up the heroin, and said,

---

**2.** "T." refers to the transcript of petitioner's trial.

" 'No, no, they are okay, I know them.' " T. 149. Palmieri went to the trunk of the car, thereby signaling the undercover team members that they should arrest anyone with him, and he simultaneously activated an electronic alarm.

As Palmieri moved toward the back of the car, petitioner, who had remained three feet from Palmieri's car on the passenger side, began to back up. Palmieri lost track of petitioner "for maybe a couple of seconds" as he got out of the car, T. 129; then, after signaling his team, Palmieri grabbed petitioner near the car. Taylor fled the scene with law enforcement officials in pursuit and was subsequently apprehended. Samm was apprehended by officials near the scene.

The informant and Special Agent Abrams then entered the building at 51 West 116th Street. Palmieri testified that, while this was going on, he did not know where the case containing the heroin was. Subsequently, the informant and Special Agent Abrams emerged from the building, carrying a black gun case. Palmieri testified that he examined the case and confirmed that it was the same case, with the same contents, that Taylor had given him earlier. He also testified that the black gun case was the same case from which Henry had taken the clear plastic bag during the 7 p.m. transaction. T. 119.

On cross-examination by Taylor's counsel, Palmieri testified that, at the time of the arrests, he did not know where the drugs were; neither Henry nor Taylor had them. Then, in response to a question from Taylor's counsel, and without objection from petitioner's counsel, Palmieri testified as follows:

> Now, somewhere, I'm not sure of exactly how long afterwards, but I was told that the informant saw Mr. Henry pass, flip the package to another person that was in the hallway that was right by the door of the building of 51. Further, when this arrest went down, that individual ran up to the same apartment that the informant says that he was in originally with the defendants.

T. 192.

Henry's counsel elicited that Henry had not participated in the conversations Palmieri had had earlier with Taylor, and that his contact with Henry at that time took two to three minutes, but that Henry was in Palmieri's view for a total of 17 or 18 minutes that evening. Counsel for Henry also elicited that the confidential informant had a financial interest in the recovery of drugs and that, had no drugs been found, he would have received less money from the police. He also elicited that no police officer ever saw what happened to the drugs.

Police Officer Richard Ford testified that, on March 24, 1980, he worked as "close backup"; his duties were to remain close to Palmieri and the confidential informant to ensure their safety and to make observations. Ford testified that, at approximately 7:15 that evening, he was sitting in a car across 116th Street from 51 West 116th Street and the car in which Palmieri and the confidential informant sat. An individual, whom Ford "believe[d]" was Taylor and who later was identified as Taylor, approached Palmieri's car, and the confidential informant got out of the front seat of the car and into the back seat, allowing the individual to get into the front seat of the car. Palmieri and the individual engaged in conversation. After a short time, Palmieri exited the car, went to the trunk, extracted a brown paper bag and reentered the car with the bag. After further conversation, Palmieri returned the bag to the trunk of the car. Shortly thereafter, the individual exited the car, crossed the street and met with two or three other individuals on the sidewalk in front of Ford's car. At approximately 7:35 p.m., an Audi pulled up near the corner of 116th Street and Lenox Avenue. The individuals got into the Audi and, after a short while, got back out. Ford testified that Samm and the individual who had met with Palmieri earlier crossed the street back to Palmieri's car. That individual reentered Palmieri's car. After a short conversation, he exited the car and rejoined Samm on the sidewalk. Soon thereafter, the undercover team left the area.

Ford testified that he, in his car, and Palmieri and the confidential informant, in Palmieri's car, returned to 116th Street at approximately 10:00 that night. The individual later identified as Taylor came out of the

building at 51 West 116th Street. The confidential informant got out of Palmieri's car to meet the individual, and the two entered 51 West 116th Street. Approximately five minutes later, they emerged from the building and got into Palmieri's car, the individual later identified as Taylor in the front passenger seat, the confidential informant in the rear. Meanwhile, two individuals stood on the sidewalk near Palmieri's car. One walked toward and stood near the passenger window of Palmieri's car. (Although Ford, when asked if he knew the names of the individuals, said Samm and Henry, he never identified Henry in court, or by description, and respondent has never claimed that Ford identified petitioner.)

Soon thereafter, Palmieri exited the car, opened the trunk, closed it again and began to move as though he was going to re-enter the car. Ford radioed the team members to move in. Instead of reentering the car, Palmieri quickly moved around the rear of the car and Ford observed him grappling with someone. Ford testified that, by this juncture, he had left his vehicle and was running across the street toward Palmieri's car. Palmieri and the individual with whom he was engaged fell to the ground and Ford overheard Palmieri yelling, " 'What did you do with the package? Where is it?' " T. 296–97. He did not observe anyone catch the drugs, but he observed "someone in a metallic gray jacket run into the building as [he] was running across the street." T. 317. Ford then aided Palmieri in taking that individual into custody. He then apprehended another individual up the block from 51 West 116th Street, whom Ford thought to be the individual in the metallic jacket, but who turned out to be uninvolved. Then, after about a minute and a half, Ford returned to the front of 51 West 116th Street to aid the surveillance team. Palmieri and the confidential informant had left the area. Some of the surveillance team members had entered 51 West 116th Street. When they emerged, Special Agent Abrams was carrying what appeared to Ford to be a zippered pistol case. Inside the case were envelopes containing white powder. Ford identified the case and the envelopes, previously admitted

into evidence when Palmieri testified, as the ones he had seen Abrams carrying.

New York City Police Officer Santiago Martinez testified that, at 7 p.m. on March 24, 1980, he was in a car parked about a block away from 51 West 116th Street. He saw a car containing Palmieri and the informant pull up in front of the building. After a few minutes, the informant got out of the car and was approached by an individual described by Martinez as a black male in his twenties. The informant then reentered Palmieri's car, this time in the back seat, while the individual who had approached the informant got into the front seat. After a short while, this individual exited the car, crossed to the opposite side of 116th Street and approached two other males seated in an Audi. Martinez testified that, following this, he left the area.

Martinez testified that, at approximately 10 p.m. that night, he returned to the southwest corner of 116th Street and Lenox Avenue. Martinez observed Palmieri and the informant arrive in a car and again park in front of 51 West 116th Street, some 300 feet away. Martinez then saw "several males unknown to [him] approach the undercover vehicle and enter the car." T. 341. A short while later, Palmieri got out of the car and, by opening the trunk, gave a prearranged signal. Upon seeing the signal, Martinez started to drive toward Palmieri's car. Martinez testified:

> As I approached the undercover vehicle, I saw Detective Palmieri standing outside struggling with a male. At the same time I saw an individual getting out of the undercover vehicle and run and start to run [sic] from it. I stopped the car that I was driving. I got out and I started chasing this individual that I saw get out of the undercover car....

T. 341–42. Martinez identified the individual whom he chased as defendant Conrad Taylor. After pursuing Taylor for 25 or 30 feet, "Mr. Taylor [reached] into a jacket pocket and [pulled] out a gun and he pointed this gun towards" Martinez. T. 343. Martinez testified that he then slipped and fell, and the gun fell from Taylor's hand. Martinez stopped the gun from rolling with his foot

and looked up in time to see Special Agent Abrams apprehending Taylor. Abrams and Martinez then placed Taylor under arrest.

Martinez then returned to the front of 51 West 116th Street, where he saw Palmieri, Detective Robert Lamirata, Special Agent Joseph Braddock and the informant, along with a couple of other people who had been placed under arrest. Martinez testified that he, along with Abrams, a few of the other officers and the informant, entered 51 West 116th Street. Abrams and the informant had a brief conversation in the lobby. Martinez, Abrams and the informant then went to the second floor. Leaving the informant in the second floor stairwell, Martinez and Abrams then went to an apartment on the second floor. The door was open and the apartment, strewn with garbage, was vacant. Abrams found a black leather bag on a counter in the kitchen. Martinez testified that Abrams opened the bag and showed him "that it contained several clear plastic bags which contained a white powder in them." T. 376. Martinez identified the gun case entered into evidence by the prosecution as the bag Abrams discovered in the apartment. Abrams brought the bag outside and showed it to Palmieri, whom the informant had rejoined.

Henry's counsel elicited that Martinez saw only one individual, twice, get into Palmieri's car. He had identified that person previously as Taylor. Martinez did not see the drugs change hands and never identified petitioner as being present.

DEA Special Agent Donald Abrams testified that, on March 24, 1980, he was working as a surveillance officer, whose responsibility it was to ensure the safety of the undercover officers and informant. At approximately 7 p.m. that evening, Abrams rode in his car, behind Palmieri and the informant in another car, to 116th Street. After Palmieri parked his car, Abrams continued in his car and parked a block to a block and a half past Palmieri's car. Abrams testified that, approximately five minutes after Palmieri parked his car, he observed a black male enter Palmieri's car. Abrams observed nothing else of significance before leaving the area at approximately 7:30 p.m. He testified

that he returned to the area at approximately 10 p.m. that night. As earlier, he followed Palmieri into the area. Palmieri parked his car, and Abrams parked his car, in approximately the same places as each had parked earlier that evening. Abrams testified that, approximately a half hour later, he saw Palmieri get out of his car and move to the trunk. At the same time, Abrams received word by radio from another agent that Palmieri had activated his agent alarm device. Abrams then drove his car to the vicinity of Palmieri's car, stopped and got out.

Abrams observed Palmieri restraining an individual near the front of his vehicle. Simultaneously, he observed an individual, later identified as defendant Taylor, exit Palmieri's car and flee in a westerly direction down 116th Street. Abrams and Officer Martinez pursued Taylor. Abrams testified that, when he was approximately ten feet behind Martinez and Taylor, who were separated by only three to five feet, he observed that Taylor was pointing a gun at Martinez. "At exactly that point, Police Officer Martinez fell to the ground and as Police Officer Martinez fell to the ground I heard what I thought was the gun also fall to the ground...." T. 431. After checking that Martinez was all right and confirming that Taylor no longer had a gun, Abrams chased Taylor for a short distance and then apprehended him. Martinez came over and showed Abrams the gun. Abrams and Martinez, along with Taylor, then returned to the vicinity of 51 West 116th Street and rejoined the informant, Palmieri and several other agents. Then, accompanied by the informant, Officer Martinez, two uniformed police officers and possibly another team member, Abrams entered 51 West 116th Street. Leaving the informant in the lobby, Abrams and the other agents and officers ascended the stairs to the second floor landing. After the second floor landing had been secured, Abrams directed the informant to join the others. Shortly thereafter, the informant returned down the stairs. Abrams and the others proceeded to enter a second floor apartment. The apartment appeared to him "to be an abandoned apartment all full of trash and refuse." T. 436. On top of the kitchen counter, Abrams found a black gun

case containing six plastic bags of white powder. Abrams rejoined the informant, Palmieri and the rest of the team, and showed them the case. Abrams then took the gun case to his office. Abrams identified the case he found in the apartment as the case entered into evidence by the prosecution.

Taylor's counsel elicited that Abrams, who had binoculars with him which he may have been using at the time, did not observe anything being thrown out of Palmieri's car.

New York City Police Officer Robert Lamirata testified that, on March 24, 1980, he served as a surveillance officer in "a 'buy-bust' operation." Lamirata was in a car some two blocks away from Palmieri's car when he received a radio call that Palmieri had signaled the team to move in. At this point, Lamirata drove to Palmieri's car and found Palmieri, the informant, Abrams, Martinez and three individuals who had been apprehended. Lamirata testified that, while he did not remember seeing Abrams entering 51 West 116th Street, he did observe Abrams emerge from the building.

Lamirata testified that he processed the three apprehended individuals at his office. After Lamirata had advised defendant Taylor of his rights, Taylor made an oral statement, which he then put into writing. Lamirata testified that the written statement read as follows:

"Gino came to me today, March 24, 1980, and told me that he needed 1½ pounds heroin. We went to the store and got some boleta and Hue, Steve and I mixed it up together with the quarters and the boleta to make the weight. So I told Gino to come back 10 o'clock. When Sal and Gino come back, Hue, Steve and I went to the car and Hue gave me the stuff and I gave it to Sal so Sal told me to leave the stuff in the car so I didn't see any money so I gave it back to Hue and Sal went to the trunk of the car to get the money. By that time Sal ran towards Hue who had the stuff. Then we knew it was the police. And they held us up against the wall until they found the stuff someplace. This happened after I ran down the street. The

gun fell out of the pocket and then they was looking for the stuff. They went someplace upstairs and came out with a black bag and took us down. . . ."

T. 487–88. Counsel for petitioner did not object to the written statement being admitted into evidence. He objected only to its being read to the jury on the ground that it was already in evidence. T. 485–86. Lamirata testified that "boleta" is used to cut heroin. The district attorney inquired of Lamirata, "Did you ask Conrad Taylor to whom he was referring when he wrote in that statement the word 'Hue'?" T. 488. Lamirata replied, "Yes, the defendant Henry." T. 488. On cross-examination by Taylor's counsel, Lamirata testified, without objection, that he attempted to get a statement from Henry and was asked, "In any event, no statement was forthcoming from Harold Henry?" to which he responded "No." T. 493–94.

Police Chemist Richard D. Karasiewski testified that the six plastic bags contained in the gun case identified by Palmieri, Ford, Martinez and Abrams contained approximately 8 ounces of white powder, consisting of heroin, quinine, dextrose, mannitol and cornstarch.

### The Defendants' Evidence and Henry's Counsel's Summation

Both defendants waived opening statements. Each of the defendants took the stand and testified that he was not in the area of the 7 p.m. police operation and that he was innocently in the area of the 10 p.m. police operation and was mistakenly arrested. Defendant Conrad Taylor testified that, while he did not remember exactly where he was at 7 p.m. on March 24, 1980, he was in Brooklyn at that time, and did not meet with undercover agents. He was in the area of 116th Street at 10 p.m. that evening, but did not meet with police officers or agents until he was arrested. He denied seeing anybody "show [him] a wad of money," (T. 526), and denied using or selling drugs.[3] T. 526.

Taylor testified that, at about 9:30 or 10:00 p.m. that night, he traveled to visit his girlfriend, who lived on 115th Street between

---

3. On cross-examination, Taylor admitted that he had previously used "reefer." T. 589.

Lenox and Fifth Avenues. When he arrived at his girlfriend's apartment, he found that she was not there and decided to see if she was at an after-hours club, "Vicks," at 52 West 116th Street, which he had previously visited with her.[4] He did not find her there. T. 530. It was raining and he stood in the doorway, to be shielded from rain for a couple of minutes. T. 530, 586. He testified that, when he left the club, he found a state of mayhem on the street. He saw people were running. He testified:

> I don't know why they was [sic] running, you know, so I started running, too, because I ain't going to stand around to find out what they are running for.... I ran for about, good 50, 75 yards, from the club, you know, and next thing I knew this police officer, you know, he ran from behind me and like, you know, 'yoked' me, you know.

T. 531. Taylor testified that the police arrested "four other people back at the club...." T. 532. One of them was petitioner, whom Taylor testified he had never met prior to their arrest. Taylor testified that petitioner had introduced himself to Taylor as "Hugh" while in temporary custody immediately after they had been arrested. Taylor testified that the police punched him, and kicked petitioner. Taylor testified that, in particular, Abrams, Palmieri and Martinez beat him. He testified that Officer Lamirata, who had testified that he read Taylor his rights at the DEA Office, had had no dealings with him that evening. He testified that the police had coerced him to give his written statement by beating him. The police told him what to write at certain parts of the statement, and Abrams put a gun in his mouth. He prepared two statements before the final version, but the police ripped up

both as unsatisfactory. He could not remember what was in the second statement. Taylor testified that he had never heard the word boleta before that day. With regard to what he claimed to be the third statement, he testified: "Some [of the language] is mine and some is theirs, put it that way." T. 544. Taylor said of the statement, "None of this is true...." T. 545. Taylor testified that Fekete, who signed the final statement, was not in the room when Taylor prepared it. Photos of Taylor following the alleged beating were received into evidence; they disclosed no visible marks or scars on Taylor's face. However, on redirect examination, Taylor testified that the beating he had sustained did not include blows to the head. Finally, Taylor testified that the gun case entered into evidence by the People was not his.

Henry testified that, on March 24, 1980, he lived in Brooklyn and went to his mother's apartment at 200 West 113th Street in Manhattan. Between 6 and 7 p.m., he was in her apartment although she was not home.[5] He waited for his mother to return home from Bible study; she returned home at 9:30 or 9:45 p.m. Petitioner testified that he then "went out on the street at 116th where they gamble and cook West Indian food." T. 607. He entered a building, a "particular West Indian spot, where most Indians hang out," and had something to eat and drink and played some craps. T. 607–08. He emerged from the building at "[a]bout 10, 10:15, 20 after 10." T. 608. He testified:

> Well, I met some other guys down there because it was raining and none that I know of personally as friends, and all of a sudden everybody started running. I didn't run anywhere, I stand right there because I didn't know what they were running from, I didn't have intent to have

---

**4.** On cross-examination, Taylor testified that he also went to shoot craps at another club on 116th Street. He testified that, when he left, he picked up a folded ten dollar bill, which Taylor knew to contain a drug of some sort. Later, upon his arrest, the folded bill was taken from him and found to contain cocaine.

**5.** On cross examination, petitioner testified as follows:

> Q Now, what time did you get there on March 24, 1980?

> A Get where?
> Q To your mother's.
> A Around 8:25.
> Q Didn't you say earlier you got there and you were there between 6 and 7?
> A No.
> Q You didn't say that?
> A No.
> Q All right, you got to your mother's.
> A Yeah, around that time, yeah.

T. 624.

running anywhere [sic] because I didn't do anything of the sort. Next thing I knew, or know, I see police officers start coming in and bringing one guy, two guys. One run up on me and put his hand under my neck, jammed me up against the hallway door so I had to defend myself. I said, "What's happening," you know, he held me, arrested me.

T. 608–09 The police beat him, and he heard some officers enter a building. He heard glass breaking two or three flights above the street and subsequently heard an officer announce, " 'I found it, I found it.' " T. 609. Petitioner denied entering Palmieri's car at approximately 7:30 p.m. He stated that he was, at that time, waiting for his mother at the apartment. He testified that he had never before seen the gun case that was in evidence and that he met Taylor for the first time after their arrest. On cross-examination, he testified that the police threatened him, but did not beat him. He was never read his rights. He was never directed to give a statement.

On summation, counsel for Henry emphasized that the confidential informant had a financial interest in the events at issue and would get a thousand dollars for a few hours work. He also emphasized the absence of the confidential informant at the trial: "[H]e never took the witness stand here, you never got to see him, you never got to measure his credibility, you never got to size him up." T. 675, T. 677. He argued that the jurors could not know the informant's relationship with Palmieri because of his absence at trial.

Counsel expressed skepticism about a police operation in which the police went to pick up one and a half pounds of heroin, on a phone call, with no preparation. He also argued that the police officer's reasons for not using transmittal devices, which would have resulted in tapes of the conversations, were not convincing.

He then argued that neither of the "trained observers," Officers Ford and Martinez, there to observe the transaction, saw "the drugs go out of the car," T. 677, 678, 684, and that the inference to draw from this was that it did not happen the way the prosecution said it did. T. 678. Returning to the confidential informant, he called it "strange that the only person who knew where the drugs were was the confidential informant" who would benefit financially from the deal. T. 678–79. He further expressed skepticism that the drugs would have been left in plain view in an abandoned apartment rather than hidden or destroyed.

Defense counsel then argued that his client was credible and urged the jury to consider that police officers are as interested in the outcomes of their arrests as defendants, in that their careers would be affected.

### Prosecution Summation and Charge

Those aspects of the prosecutor's summation and the judge's charge which are at issue will be discussed in detail below. Briefly, the prosecutor relied upon Taylor's confession not only as evidence against Taylor but also as evidence against Henry; the court charged the jury that it could consider that confession against both defendants; and the court, in marshalling the evidence referred to the hearsay evidence of the informant that Henry had tossed the drugs to another person who then took them into the nearby building where they were found by the police. Henry's counsel did not object to any of this. Nor did he request a missing witness charge as to the informant.

### DISCUSSION

Henry makes a variety of claims of constitutional error. Following initial review of the petition, I appointed counsel to represent Henry, specifically for the purpose of addressing the effectiveness of his trial counsel. Before addressing what I now find to be Henry's meritorious claim that his trial counsel's performance violated Henry's Sixth Amendment right to effective representation, I will address his other, nonmeritorious claims.

### SUFFICIENCY OF THE EVIDENCE

 Petitioner argues that the prosecution failed to prove his guilt beyond a reasonable doubt. In a federal habeas corpus proceeding challenging the sufficiency of the evidence underlying a state court conviction, the federal court must determine whether

the evidence was sufficient to support a finding of guilt beyond a reasonable doubt, with explicit reference to the substantive elements of the criminal offense as defined by state law. *Jackson v. Virginia*, 443 U.S. 307, 324 n. 16, 99 S.Ct. 2781, 2792 n. 16, 61 L.Ed.2d 560 (1979).

> [T]his inquiry does not require a court to "ask itself whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Id.* at 318–19, 99 S.Ct. at 2789 (quoting *Woodby v. INS*, 385 U.S. 276, 282, 87 S.Ct. 483, 486, 17 L.Ed.2d 362 (1966)) (emphasis in original). Under this standard, the trier of fact is left to fairly resolve conflicts or discrepancies in the testimony by weighing the evidence and drawing reasonable inferences. *Id.* "[W]hether a witness is relating the truth is a factual matter exclusively within the province of the jury to determine." *Robinson v. Smith*, 530 F.Supp. 1386, 1390 (W.D.N.Y.1982). As stated in *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977):

> We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

■■ Thus, "[a]s a general matter, issues of witness credibility are to be resolved by the jury and are not to be redetermined by federal courts in a habeas corpus proceeding." *Soto v. Lefevre*, 651 F.Supp. 588, 592 (S.D.N.Y.1986), *aff'd mem.*, 812 F.2d 713 (2d Cir.), *cert. denied*, 482 U.S. 907, 107 S.Ct. 2486, 96 L.Ed.2d 378 (1987). As to evidence of identification, "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction." *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir.), *cert. denied sub nom., Gore v. United States*, 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979).

■ A review of the record in the light most favorable to the prosecution (and without regard to the evidence which I find was admitted as the result of defense counsel's failure to object to it), demonstrates that a rational factfinder could have found petitioner guilty beyond a reasonable doubt of both Criminal Sale and Possession of a Controlled Substance, First Degree. From the testimony of the narcotics officers, it could be concluded that Taylor and Henry were working together to sell heroin to Palmieri. The credibility of the narcotics officers and the accuracy of Palmieri's identification of Henry were issues for the jury to resolve.

Petitioner's argument that the record "is absent of proof establishing that petitioner controlled the police[-]recovered narcotics, or that it was petitioner who offered the white powder for the proposed sale" is without merit. Petitioner was charged with possession and sale of narcotics *in concert with* co-defendant Taylor. T. 755–56. New York Penal Law § 20.00 provides that, "[w]hen one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct." According to Palmieri, at the 7 p.m. transaction, Henry had approached Palmieri's car along with Taylor and stood near the car while Taylor got into the car and arranged the drug sale. After Taylor left the car and met with Henry and two others, Henry got into Palmieri's car and removed, from a black gun case, a clear plastic bag that contained a quantity of white powder. When Palmieri complained to Henry that he had agreed with Taylor to buy a larger quantity of heroin, Henry left the car and rejoined Taylor, who then reentered the car and said he would do the deal at 10 p.m. At the 10 p.m. meeting, Taylor was seen exiting a building with Henry. Taylor then entered Palmieri's car and gave him the black gun case containing six bags of white powder. During this transaction, Henry was standing alongside the car. When Taylor

threw the heroin out the car window, Henry picked it up.

The evidence, seen in the light most favorable to the prosecution, supports the conclusion that petitioner was a knowing participant in the narcotics transaction conducted that evening. That is all that was required. Accordingly, petitioner's claim of insufficiency is without merit.

### FIFTH AMENDMENT CLAIMS

#### Improper Questioning About an Unrelated Occasion on Which Henry Was Stopped by Police.

Petitioner claims that

it was error for the prosecutor to cross-examine petitioner on a wholly unrelated matter in which he had been stopped and questioned by police. Despite a successful ruling to preclude, the prosecutor sought to depict petitioner as a drug dealer by pointing out to the jury a date wholly unrelated to the case on trial, that petitioner was stopped by police officers, and he gave the name 'Harold Henry' rather than Hugh Harold Henry, his true and complete name.

Petition at 6. Before the commencement of the trial, counsel for petitioner made a motion pursuant to *People v. Sandoval*, 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974), to preclude the prosecution from cross-examining petitioner on the subject of two indictments then outstanding against petitioner. T. 15–25. The Court granted the motion conditionally, saying:

The defendant may take the stand and may not be examined in respect to the underlying events supporting the open charges against him unless in the course of his direct testimony he offers evidence of his innocence based upon a representation that he has not ever before been involved in the possession and involvement with drugs. If he does so testify, then the People may examine him in respect to the facts underlying the prior indictments.

T. 21–22. The following colloquy then ensued:

MR. CALHELHA [THE PROSECUTOR]: Your Honor, may I just ask for clarification of your ruling? There are some things, some facts which arose from his arrest on each of those other two indictments. For instance, on the second indictment the defendant used an alias while he was out and there was a bench warrant on this case. It's clear that he used that alias, Hugh Henry, in an attempt to avoid being brought back to court so he would have to appear on this indictment. . . .

In addition, he has provided to various interviewers on the times that he was arrested, the three times that we know he was arrested, various different dates of birth, places of residence, et cetera.

I just want to clarify that your ruling relates to the underlying facts concerning narcotics traffic and not to the facts that the defendant has used aliases in the past, has presented different—has attempted to avoid—

\* \* \* \* \* \*

THE COURT: . . . Mr. Calhelha has questioned whether other incidental information inconsistent with the information given on trial here may be used, and I would think so.

MR. JAMES [PETITIONER'S COUNSEL]: Judge, as long as it's not indicated in this light: Isn't it a fact, Mr. Henry, when you were arrested on March 19th here in Kings County you gave this address? You see what I am saying, Judge? I am sure that the District Attorney will phrase a proper question when he gets into that area of interrogation.

THE COURT: I assume he has the name of the arresting officer, and he would phrase a question: Isn't it a fact on such and such a date that you told John Jones, a member of the Police Department, that your name was such and such? That doesn't necessarily imply an arrest.

MR. JAMES: I have no problem with that, Judge.

THE COURT: I am merely suggesting that the thrust of my ruling is to preclude cross-examination in respect to the prior narcotics involvement, the arrests and the underlying facts in connection therewith,

unless the defendant purports to demand to this jury that he is purer than the driven snow . . . .

T. 22–25.

During cross-examination, the prosecutor examined petitioner as follows:

Q. On January 7, 1981, do you remember telling a Police Officer Sara that your name was Hugh Henry?

A January when?

Q Police Officer Sara, January 7, 1981—

MR. JAMES: Objected to, your Honor.

THE COURT: I'll allow it. You may answer yes or no.

A Yeah.

Q Did you tell that police officer that your middle name was Harold?

A I can't remember if I did.

MR. CALHELHA: Can we have that marked as People's 9 for identification, your Honor?

(People's Exhibit 9 marked for identification.)

Q Look at the very first line, top left, Mr. Henry.

A Yes.

Q. Does that refresh your recollection as to what you told Police Officer Sara your name was on that date?

A Yeah.

Q Did you tell them your name was Hugh Harold Henry?

A Yeah.

Q You did?

A Yeah.

T. 617–18.

Petitioner's contention is meritless. The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself . . . ." However,

[a] defendant who testifies at trial waives his Fifth Amendment privilege and may be cross-examined on matters made relevant by his direct testimony. *Brown v. United States*, 356 U.S. 148, 154–56, 78 S.Ct. 622, 626–27, 2 L.Ed.2d 589 (1958); *accord*

*McGautha v. California*, 402 U.S. 183, 215, 91 S.Ct. 1454, 1471, 28 L.Ed.2d 711 (1971). *United States v. Black*, 767 F.2d 1334, 1341 (9th Cir.), *cert. denied*, 474 U.S. 1022, 106 S.Ct. 574, 88 L.Ed.2d 557 (1985).

The trial judge decided that questions relating to aliases used by petitioner properly fell within allowable cross-examination. "Discretionary evidentiary rulings by [a] state court trial judge are not reviewable on habeas corpus petition unless the rulings infringe a particular constitutional right of the petitioner." *McCormack v. Walters*, 550 F.Supp. 80, 81 (S.D.N.Y.1982). "The scope of the defendant's waiver [of his Fifth Amendment privilege] is coextensive with the scope of relevant cross-examination. Fixing the extent of cross-examination, in turn, is left to the discretion of the trial judge." *Black*, 767 F.2d at 1341 (citations omitted).

Petitioner suffered no Fifth Amendment violation. The prosecutor remained within the bounds authorized by the trial judge; and the trial judge instructed the jury "to decide the guilt or lack of guilt of each of [the] defendants solely on the evidence submitted during the trial" and cautioned the jury not to speculate. T. 725. Petitioner's claim should be rejected.

*Use of Henry's Silence.*

Henry claims that his rights were violated when Officer Lamirata, in response to cross-examination by Taylor's counsel, testified that petitioner had refused to make a statement in the face of questioning by police. Petitioner's trial counsel did not object to Taylor's counsel's question or to Officer Lamirata's answer.

"[T]he use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976); *See Brecht v. Abrahamson*, 507 U.S. 619, 627, 113 S.Ct. 1710, 1716, 123 L.Ed.2d 353 (1993); *Greer v. Miller*, 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987). Here, petitioner suffered no *Doyle* error. "While a single comment alone may sometimes constitute a *Doyle* violation, the

Supreme Court's opinion in *Greer* makes clear that a single mention does not automatically suffice to violate defendant's rights when the government does not specifically and expressly attempt to *use*—as was attempted in *Doyle* and in *Greer*—the improper comment to impeach the defendant." *United States v. Stubbs*, 944 F.2d 828, 835 (11th Cir.1991).

Here, it was Taylor's counsel and not the prosecution who elicited the fact that petitioner made no post-*Miranda* statement, and it is clear that Taylor's counsel was not in any way using the lack of a statement from Henry to impeach Henry. (Henry himself, on cross-examination, testified, although not asked by the prosecution, that he refused to make a statement to the police. T. 629–30.) Although the prosecutor in summation referred once to Henry's not making a statement, he did so merely as part of his summary of Henry's testimony and in no way suggested that Henry, if innocent, would have made a statement. T. 705. In sum, neither Taylor's counsel nor the prosecution attempted to use Henry's failure to make a statement to "impeach an explanation subsequently offered at trial." *Doyle*, 426 U.S. at 618, 96 S.Ct. at 2245.

### IMPROPER SUMMATION BY THE PROSECUTOR

█ Federal habeas corpus relief is available on the basis of improper prosecutorial statements at trial only where the prosecutor's errors were so fundamentally unfair as to deny the defendant a fair trial. *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471–72, 91 L.Ed.2d 144 (1986). Courts must "consider whether such remarks, in the context of the entire trial, were sufficiently prejudicial to violate [a habeas petitioner's] due process rights." *Donnelly v. DeChristoforo*, 416 U.S. 637, 639, 94 S.Ct. 1868, 1869–70, 40 L.Ed.2d 431 (1974); *see also Floyd v. Meachum*, 907 F.2d 347 (2d Cir.1990). "[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone...." *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). *See United States v. Myerson*, 18 F.3d 153, 162–63 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 159, 130 L.Ed.2d 97 (1994).

Petitioner raises two complaints about the prosecutor's summation which he claims establish prosecutorial misconduct. Petitioner claims first that "the prosecutor incorrectly summed up stating that it was the burden of the defense counsel to 'convince' one or more jurors. The prosecutor's statement left the double misrepresentation that the defense shouldered a burden of proof in the case and that this burden required them to 'convince' the jury of their position." Petition at 6. Petitioner apparently refers to the following portion of the prosecutor's summation:

> First I'm going to address some nonissues that have been raised by Mr. James and Mr. Veneziano [counsel for the defendants].

> Issues which are not before you and which I suggest are not relevant to the trial. The fact that I answer or rebut those arguments does not mean that I believe that these arguments or issues are important to the case.

> However, as you recall I have to convince all 12 of you. Your verdict has to be unanimous. All Mr. James or Mr. Veneziano has to do is to convince one of you.

T. 695.

█ This excerpt is from the beginning of the prosecution's summation, where the prosecutor was attempting to answer certain specific points raised by defense counsel during their summations and to map out the points he hoped to make during his summation. Read in context, the prosecutor's remarks were reasonable and were not intended, nor were they likely, to mislead the jury as to the burden of proof.

Moreover, the prosecutor and the trial judge stressed numerous times that the People had the burden of proving each element of the crimes charged, T. 44–45, 695, 740–43, 751, 753–54, 758–60, 763–65, 768–70. The Court also instructed the jury that the defendants were presumed innocent, T. 740; that the defendants were entitled to every inference in their favor, T. 729–30; and that the defendants were "not required to disprove

anything." T. 741. Thus, petitioner suffered no prejudice from the prosecutor's remarks.

■ Henry's claim that the prosecutor improperly denigrated "the defendant for having the temerity to testify" is unsupported by the record. Having chosen to testify, Henry's testimony was subject not only to cross-examination but also to reasonable argument by the prosecutor on summation. An examination of the prosecutor's closing statement reveals no improper language with regard to petitioner's decision to testify and no improper argument about the content of his testimony.

■ Finally, however, Henry's claim challenging "the prosecutor's statement in summation calling upon the jury to speculate as to why the informant did not testify" has merit. During the trial, the prosecution made the confidential informant available to defense counsel, both of whom, after interviewing the informant, elected not to call him as a witness. T. 412–23. During his summation, Henry's counsel emphasized that the informant had not been called as a witness. In response, the prosecutor suggested to the jurors that they use their "common sense," that "the heroin business is a dangerous business and to be a confidential informant is a dangerous thing to be," and that the informant therefore did not want his identity disclosed. T. 695–96.

■ The suggestion to the jury as to why the confidential informant did not testify, which raised the specter of the dangerousness of the heroin business, was improper and cannot be justified as an "invited response." *Cf. United States v. Young*, 470 U.S. 1, 12–13, 105 S.Ct. 1038, 1044–1045, 84 L.Ed.2d 1 (1985); *See also Darden*, 477 U.S. at 182, 106 S.Ct. at 2472. No objection was made to the remark and no curative instruction given. Nonetheless, this remark alone, in an otherwise proper summation, did not itself make the trial so fundamentally unfair as to deny the defendant a fair trial. *See Darden*, 477 U.S. at 181, 106 S.Ct. at 2471–72; *Donnelly*, 416 U.S. at 639, 94 S.Ct. at

1869–70. *See also Floyd*, 907 F.2d at 353. The reference to the heroin business being dangerous essentially described common knowledge and did not point to Henry himself being dangerous.[6]

### *SENTENCING.*

Henry's claim that his sentence was unconstitutionally harsh is without merit.

■ The Eighth Amendment's prohibition against cruel and unusual punishment "forbids only extreme sentences which are 'grossly disproportionate' to the crime." *Harmelin v. Michigan*, 501 U.S. 957, 1001, 111 S.Ct. 2680, 2705, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring in the judgment) (quoting *Solem v. Helm*, 463 U.S. 277, 288, 103 S.Ct. 3001, 3008–09, 77 L.Ed.2d 637 (1983)). Legislative determinations with regard to punishment are "primary and presumptively valid" and only warrant review in rare cases. *United States v. Gonzalez*, 922 F.2d 1044, 1053 (2d Cir.), *cert. denied*, 502 U.S. 1014, 112 S.Ct. 660, 116 L.Ed.2d 751 (1991). *See Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980). Here, the sentences were within the statutory maximums and do not present rare circumstances.

### *INEFFECTIVE ASSISTANCE OF COUNSEL*

■ "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374, 106 S.Ct. 2574, 2582, 91 L.Ed.2d 305 (1986). *See Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2063–64, 80 L.Ed.2d 674 (1984). In order to prevail, the petitioner must show both that counsel's representation fell below an objective standard of reasonableness, and that prejudice to the petitioner resulted from counsel's unprofessional errors. *Kimmelman*, 477 U.S. at 375, 106 S.Ct. at 2582–83;

---

**6.** The trial judge gave a limiting instruction for Henry as to the gun offered into evidence against

Taylor.

*Strickland,* 466 U.S. at 688, 694, 104 S.Ct. at 2064–65, 2068; *Brown v. Doe,* 2 F.3d 1236, 1246 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1088, 127 L.Ed.2d 403 (1994). *See also Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). Both elements of the *Strickland* test must be established. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland,* 466 U.S. at 700, 104 S.Ct. at 2071. An attorney's failure to raise a meritorious state law claim or defense may be the basis for a finding that a defendant was denied his federal constitutional right to effective assistance of counsel. *Claudio v. Scully,* 982 F.2d 798, 803–05 (2d Cir.1992), *cert. denied,* 508 U.S. 912, 113 S.Ct. 2347, 124 L.Ed.2d 256 (1993).

▆▆▆ "*Strickland*'s standard, although by no means insurmountable, is highly demanding." *Kimmelman,* 477 U.S. at 382, 106 S.Ct. at 2586–87. "There is a strong presumption that counsel's performance falls within the 'wide range of professional assistance,' [*Strickland,* 466 U.S.] at 689, 104 S.Ct. at 2065; the [petitioner] bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. *Id.* at 688–689, 104 S.Ct. at 2065." *Kimmelman,* 477 U.S. at 381, 106 S.Ct. at 2586. *See United States v. Aguirre,* 912 F.2d 555, 560 (2d Cir.1990).

Henry makes numerous claims of ineffectiveness. Those lacking in merit will be discussed first.

### Unmeritorious Claims.

▆▆▆ During the testimony of a witness before the grand jury, the prosecutor spoke with the jury out of the hearing of the reporter, then immediately posed a question to the witness. Petitioner asserts that counsel should have investigated this potential taint of the grand jury proceedings and should have moved to investigate the minutes of the proceedings. This claim is without merit, for Henry does not suggest any way in which he was prejudiced by counsel's inaction. *Cf. Lopez v. Riley,* 865 F.2d 30 (2d Cir.1989) (complaints regarding the conduct of a grand jury proceeding are not cognizable on a peti-

tion for habeas corpus where a petit jury has heard the evidence and convicted the petitioner).

▆▆▆ Counsel's failure to argue to the jury the inadequacy of the scientific evidence also was not prejudicial, for the record reveals, and Henry suggests, no basis for challenging the evidence that the powder entered into evidence contained narcotics.

▆▆▆ Henry also fails to show any prejudice from his counsel's failure to object to sealing of the courtroom during the testimony of the undercover officers; from his failure to investigate a juror's complaint of rude treatment; and from his failure to move for a mistrial because a court officer may have entered the jury room.

▆▆▆ Henry claims that trial counsel erroneously failed to object to the trial judge's marshalling of the evidence, as follows: "You have heard testimony Mr. Taylor was in the vehicle initially, they had discussions with Palmieri, left the vehicle, that you have heard testimony that Mr. Henry came to the vehicle shortly thereafter...." T. 744–45. Petitioner mistakenly claims that this sentence gives the impression that both petitioner and Taylor were simultaneously in the car with Palmieri, which the evidence indicates never occurred. Petitioner also claims that trial counsel erred in not objecting to the trial judge's "overall bias" against defendant in marshalling the evidence. The trial judge instructed the jury that he had no opinion as to the credibility of any witness; that, in any event, it was up to the jury to determine credibility; that he would "not marshall the evidence of each and every witness"; and that the jury was not to draw any inference from the judge's review of the evidence. T. 744. Review of the trial judge's references to the evidence reveals neither bias nor misstatement of the evidence.

### Counsel's Deficient Performance

▆▆▆ In several highly significant respects trial counsel's performance was deficient. First, counsel raised no objection to the admission into evidence against Henry of Taylor's confession, which, if believed, was devas-

tating to Henry's claim of innocence. No limiting instruction was requested, and the judge instructed the jury, without objection: "If, of course, you find the statement was voluntarily made as I have instructed you in regard thereto, you may consider that statement along with all of the other evidence before you in determining the guilt or lack of guilt of these defendants of the crime [with] which they are charged." T. 776. Trial counsel also did not object to the prosecutor's statements on summation which relied heavily on Taylor's statements implicating Henry to prove the People's case against Henry. The prosecutor stated: "Now, there isn't just one witness who saw Harold Henry pick that package up, there are two witnesses, Conrad Taylor saw Harold Henry pick up that package and Conrad Taylor put it right into the statement here, ladies and gentlemen." T. 715. Later, the prosecutor asked rhetorically, "was it Harold Henry who exhibited the first package to Detective Palmieri in the black gun case and stood by as Taylor made the delivery" and answered the question as follows: "Yes, beyond any reasonable doubt, there are two witnesses to that, Conrad Taylor and Salvatore Palmieri...." T. 717.

Henry could not have prevented the evidence as to Taylor's confession from being before the jury. *Nelson v. O'Neil*, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971);

*United States ex rel. Pugach v. Mancusi*, 441 F.2d 1073, 1075 (2d Cir.), *cert. denied*, 404 U.S. 849, 92 S.Ct. 156, 30 L.Ed.2d 88 (1971); *People v. Payne*, 35 N.Y.2d 22, 358 N.Y.S.2d 701, 315 N.E.2d 762 (1974); *People v. Diaz*, 161 A.D.2d 789, 790, 556 N.Y.S.2d 128 (2nd Dept.), *lv. denied*, 76 N.Y.2d 855, 560 N.Y.S.2d 995, 561 N.E.2d 895 (1990). However, he was entitled to a direction to the jury that the confession could be used only against Taylor. *United States v. Floyd*, 555 F.2d 45, 48–49 (2d Cir.), *cert. denied*, 434 U.S. 851, 98 S.Ct. 163, 54 L.Ed.2d 120 (1977); *In re Quinton A. (Anonymous)*, 49 N.Y.2d 328, 338, 425 N.Y.S.2d 788, 402 N.E.2d 126 (1980) ("it is a fundamental principle of evidence that, with limited exceptions ... a confession may be considered only against its maker"); *Payne*, 35 N.Y.2d at 27, 358 N.Y.S.2d 701, 315 N.E.2d 762 ("[A] codefendant had made a pretrial statement in which [defendant] was implicated. The statement of course is hearsay inadmissible against the defendant...."); *see also Bruton v. United States*, 391 U.S. 123, 128 n. 3, 88 S.Ct. 1620, 1623–24 n. 3, 20 L.Ed.2d 476 (1968). Thus, as respondent concedes, (Respondent's Brief at 35), Henry had a valid hearsay objection which trial counsel failed to raise.[7]

Respondent argues that the decision not to object was strategic and therefore within

---

7. Petitioner's counsel argues that Henry's trial counsel erred in failing to request a severance. This argument, which depends upon Henry's having had a right to a severance, is without merit. Henry has shown no federal constitutional right to a severance. *See Zafiro v. United States*, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Contrary to petitioner's argument, he would not have been entitled to a severance under New York law either. In *Payne*, 35 N.Y.2d 22, 358 N.Y.S.2d 701, 315 N.E.2d 762, upon which he relies, the New York Court of Appeals recognized that, in New York, a defendant's right to a "separate trial is broader than his right to confrontation" and held that in an "exceptional" case a separate trial would be required even where the defendant had an opportunity to confront the co-defendant whose pretrial statement inculpating the defendant was offered. In *Payne*, the Court of Appeals found such exceptional circumstances because the co-defendant's confession was essential to sustain the charge against the defendant; or, as the Court of Appeals put it, "the People were bound to rely essentially on the admissions contained in [the co-defendant's] redacted statement." 35 N.Y.2d at 28, 358

N.Y.S.2d 701, 315 N.E.2d 762. In contrast, here, Taylor's statement, while powerfully incriminating and corroborative of the other evidence against Henry, was not essential to the People's case. Every element of the People's case was made out in other evidence before the jury. There were no gaps which Taylor's confession filled.

Petitioner's argument, made when he was *pro se*, that his trial counsel was constitutionally deficient in not requesting that Taylor's confession be redacted is also without merit. Since the confession was not admissible against Henry, Henry was certainly entitled to redaction, had he requested it, but that does not end the matter of counsel's competence. Henry's counsel knew that Taylor would testify and disavow the confession; when that happened, the prosecutor would have been free to cross-examine Taylor about the entire statement. Under those circumstances, it is a common and reasonable strategy to allow damaging evidence to come in on the People's case rather than appear to be hiding it or have it highlighted by being brought out on cross-examination.

constitutional bounds. Normally, before finding counsel inadequate, an evidentiary hearing would be held, at which questions of strategy would be addressed. In this case, petitioner's trial counsel is deceased, and that is not possible. (At a pretrial conference, petitioner's counsel was asked whether he wished to have an evidentiary hearing for any other purpose and he declined.) Even assuming, however, that the failure to object was strategic, that is, that it represented a conscious decision on counsel's part, whether or not the strategy taken was within the constitutional boundaries of reasonable competence must be examined.

■ Extraordinary deference is paid to the strategic choices of counsel:

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955). *See Aguirre,* 912 F.2d at 560 (2d Cir.1990). Nonetheless, "not all strategic choices are sacrosanct. Merely labelling [counsel's] errors 'strategy' does not shield his trial performance from Sixth Amendment scrutiny." *Quartararo v. Fogg,* 679 F.Supp. 212, 247 (E.D.N.Y.), *aff'd,* 849 F.2d 1467 (2d Cir.1988) (citations omitted.)

In this case, there is no possible strategy which would have justified allowing Taylor's confession to be used as evidence against Henry. Even if it could be said to be a reasonable strategy not to ask for a limiting instruction at the time the evidence of Taylor's confession was received (in order not to

highlight the remarks about Henry), there was no strategic value in foregoing efforts to assure that Taylor's confession, if believed, would not be used against Henry. In sum, there was no strategic reason not to object to the judge's instruction to the jury that they could consider the confession against both defendants (T. 776) and not to object to the prosecution's argument on summation that there were "two witnesses," Taylor and Palmieri, against Henry. T. 717. *See Mason v. Scully,* 16 F.3d 38, 42 (2d Cir.1994) (noting counsel's duty to protect a defendant from having "the incriminating hearsay statement of a nontestifying codefendant admitted in evidence against him.")

■ Even if it can be assumed from the record that Taylor and Henry presented a "joint" defense, as the State argues, there was nothing about such a strategy which required Henry to forego so significant an evidentiary principle, to which he was admittedly entitled, as that Taylor's confession could not be used against him. In sum, counsel's failure to object to the use of inadmissible hearsay which powerfully incriminated his client was clearly unreasonable. *See Id.* at 44. "A single, serious error" can support a claim of ineffectiveness of counsel. *Kimmelman,* 477 U.S. at 383, 384–87, 106 S.Ct. at 2587, 2587–89. Here the error was grave.

■ Moreover, counsel's performance was deficient in other respects as well. Taylor's counsel elicited from Detective Palmieri, without objection from Henry's counsel, the following statement, which respondent acknowledges was hearsay (Resp.Br. at 38):

"Now, somewhere, I'm not sure of exactly how long afterwards, but I was told that the informant saw Mr. Henry pass, flip the package to another person that was in the hallway that was right by the door of the building of 51. Further, when this arrest went down, that individual ran up to the same apartment that the informant says that he was in originally with the defendants."

T. 192.[8] The prejudicial effect of this hearsay was compounded by the trial judge's

---

8. Relying on Justice Soloff's 1985 decision, re-

spondent argues that this factual basis for Hen-

remark to the jury while marshalling the evidence:

> You have heard the testimony that ... two unidentified white males exited the vehicle that had parked just a short distance from the front of the vehicle in which Palmieri and Taylor were seated with Henry standing at the window and that Taylor said something to the effect that "It's the man," and threw the bag out the window and that Henry picked it up and tossed it to some other person, apparently tossed to some other person in the doorway of 51 West 116th Street....

T. 745–46. Again, no objection was made by trial counsel.

 Finally, in a closely related act of professional incompetence, counsel failed to request a missing witness charge as to the confidential informant.[9] The failure of the prosecution to call the confidential informant in this case met all the requirements for such a charge. The confidential informant was knowledgeable about the events in issue and could be expected to provide noncumulative testimony favorable to the prosecution. Although the informant was made available to the defense, under New York law a confidential informant is under the control of the prosecution and the witness's mere "physical availability" did not affect Henry's right to the charge. *People v. Vasquez,* 76 N.Y.2d 722, 557 N.Y.S.2d 873, 557 N.E.2d 109 (1990); *People v. Gonzalez,* 68 N.Y.2d 424, 509 N.Y.S.2d 796, 502 N.E.2d 583 (1986). Although the *Gonzalez* case, setting forth at length the reach of the missing witness rule in New York, had not been decided at the time of Henry's trial, the right to such a charge was already clear; indeed, under the facts of this case, New York law existing at the time of the trial required the giving of such a charge even though, as respondent notes, the confidential informant had been made available for the defense to interview. *People v. Ramirez,* 73 A.D.2d 567, 422 N.Y.S.2d 963 (1st Dept.1979). *See People v. Brown,* 34 N.Y.2d 658, 355 N.Y.S.2d 579, 311 N.E.2d 650 (1974). No possible strategy could support the failure to request a missing witness charge, which the New York Court of Appeals has recognized as a potentially powerful tool for the defense. *See Vasquez,* 76 N.Y.2d at 725, 557 N.Y.S.2d 873, 557 N.E.2d 109.

Respondent relies upon *Solis v. Walker,* 799 F.Supp. 23, 25 (S.D.N.Y.1992), which held that a missing witness instruction, as to an informant, is not constitutionally required. But the ineffectiveness of counsel's failure to request the instruction does not depend upon the instruction being constitutionally required. As the Court of Appeals for the Second Circuit has expressly recognized, an attorney's failure to raise a meritorious state law claim or defense may be the basis for a finding that a defendant was denied his federal constitutional right to effective assis-

---

ry's ineffectiveness claim and certain others (not including the basis relating to Taylor's confession) are procedurally barred. An alternative holding, such as that issued by Justice Soloff, can meet the requirement of a clear and express reliance on a state procedural bar. *See Velasquez v. Leonardo,* 898 F.2d 7, 9 (2d Cir.1990). However, given the unusual procedural history in this case, and the lack of a full record as to the prior state court proceedings, I cannot confidently conclude that the state courts in fact rejected this particular claim on an adequate and independent state ground as required by *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). The papers on the 1983 motion, including the decision on the motion, have not been provided to this court. Moreover, the most recent state court decision in this case, that of Justice Roberts, on a motion in which Henry explicitly raised the claim at issue, denied the motion on the ground that the issues presented had previously been decided *on the merits,* not that they had been denied on procedural grounds. See also A.D.A. Irizarry's Afft. of July 3, 1985, ¶ 16, urging that, although some particular claims of ineffectiveness had not been expressly raised before, "the general issue of ineffective counsel was fully reviewed on appeal" and rejected on the merits by the Appellate Division; for that reason, the State sought denial of the 1985 motion. Moreover, as the statement of A.D.A. Irizarry recognizes, in reviewing an ineffectiveness claim, the court must necessarily evaluate counsel's entire conduct at trial, both to determine whether the alleged conduct was constitutionally inadequate or part of a sound strategy and to determine the prejudice to the petitioner.

9. For the same reasons set forth in Footnote 8, I reject respondent's argument that this claim should not be addressed because it is procedurally barred.

tance of counsel. *Claudio,* 982 F.2d at 803–05.

In sum, although defense counsel's performance should be viewed in light of his total performance, and in some respects he was adequate,[10] the errors he committed were so egregious, and so unsupported by a reasonable strategy, that his overall performance must be considered constitutionally deficient.

**Prejudice.**

■■■ Petitioner is entitled to relief only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. *See also Kimmelman,* 477 U.S. at 381, 106 S.Ct. at 2586. *Nix v. Whiteside,* 475 U.S. 157, 175, 106 S.Ct. 988, 998–99, 89 L.Ed.2d 123 (1986). While petitioner is not required to prove "that counsel's deficient conduct more likely than not altered the outcome in the case" (*Strickland,* 466 U.S. at 693, 104 S.Ct. at 2068), he must establish "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069.[11]

■■■ "Where, as here, petitioner's claim rests in part upon the failure to object to the admission of evidence, it is necessary to determine whether the evidence was so damaging that counsel's failure to object deprived petitioner of the 'reasonably effective assistance' to which he is entitled." *Quartararo,* 679 F.Supp. at 240. "[I]n determining the existence *vel non* of prejudice, the court 'must consider the totality of the evidence before the judge or jury.'" *Kimmelman,* 477 U.S. at 381, 106 S.Ct. at 2586 (quoting *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068–69). Even if the evidence admitted as the result of counsel's error "may not have been as important as other components of the State's case, it may have tipped the balance." *Kimmelman,* 477 U.S. at 390, 106 S.Ct. at 2591. Thus, the Court must consider whether it is confident that the verdict of the jury would not have changed had the errors described above not occurred. *See Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

■■■ Upon review of the entire trial, I conclude that the admission of Taylor's confession against Henry prejudiced petitioner's case. The confession described petitioner as a significant player in the drug sales operation. It refuted petitioner's contention that he was in the area innocently and had never, before that evening, met Taylor. Indeed, it provided a complete and independent basis for the jury to find petitioner guilty beyond a reasonable doubt. Thus, even though the

---

**10.** Henry's trial counsel, on cross-examination of the police witnesses, established that no drugs or money were found on petitioner; that only Palmieri witnessed Taylor throw the gun case to petitioner; that no one witnessed petitioner dispose of the case; that Palmieri never verified that the powder he found in the gun case allegedly handed to him by petitioner was a narcotic; and that the informant had a monetary interest in the convictions of the two defendants. Counsel stressed these facts on summation and argued that petitioner was mistakenly arrested. Trial counsel also made a pretrial *Sandoval* motion; interviewed the informant to determine whether he should be called as a witness; and asked the Court to instruct the jury that the evidence involving the gun found on Taylor was inadmissible with respect to petitioner.

**11.** In *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), the Supreme Court, while retaining the basic contours of the *Strickland* test, noted that "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart,* 506 U.S. at 369, 113 S.Ct. at

842. The Court explained that "[u]nreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Id.* at 372, 113 S.Ct. at 844. In *Lockhart,* trial counsel at the capital stage of petitioner's bifurcated Arkansas state trial failed to raise an objection based upon then sound Eighth Circuit law. Had such an objection been made and upheld, petitioner would not have been sentenced to death. Subsequently, petitioner sought a writ of habeas corpus in federal court. The case reached the Court of Appeals for the Eighth Circuit which, though it had overruled the case upon which the omitted objection would have been based, held that petitioner was nevertheless prejudiced by counsel's failure to raise the objection. The Supreme Court reversed, holding that petitioner had no right to the windfall he would have received had counsel made the objection and had the objection been upheld. Here, in contrast, petitioner was deprived of substantive rights to which he was entitled, under the law both then and now.

evidence of petitioner's guilt, aside from Taylor's confession and the inadmissible hearsay, was sufficient for the jury to have found petitioner guilty beyond a reasonable doubt, the court cannot be confident that the jury verdict would not have been different had the confession not been admitted against Henry, especially when admission of the confession is considered in combination with the admission of the improper hearsay and the absence of a missing witness charge.

The significance of the improperly admitted evidence to the People's case is confirmed by the use made of it, without objection from Henry's counsel, by the prosecutor, who emphasized that the jury not only had Palmieri's word that Henry had been involved in the drug transaction but also Taylor's. Moreover, the trial judge, without objection, explicitly charged the jury that it could consider Taylor's confession, if it believed the confession was given voluntarily, against both defendants.

As for the hearsay evidence that Henry passed the alleged narcotics to another individual who ran into the building where the drugs were found, respondent argues that "any error was clearly harmless in light of the overwhelming evidence of petitioner's guilt" and that the hearsay "was not necessary to sustain petitioner's conviction." Resp.Br. at 38–39. To begin with, absent Taylor's confession, the evidence against Henry, though legally sufficient, cannot be considered overwhelming, since the prosecution's case against Henry was based almost entirely on the testimony of a single officer whose credibility had to be considered against that of Henry, who also testified. This is highlighted when the evidence against petitioner is compared with the overwhelming evidence of Taylor's guilt. *See Holland v. Scully,* 797 F.2d 57 (2d Cir.), *cert. denied,* 479 U.S. 870, 107 S.Ct. 237, 93 L.Ed.2d 162 (1986); *Quartararo,* 679 F.Supp. at 247. Several police officers identified co-defendant Taylor, but only Palmieri identified petitioner. Nor was Palmieri's identification of petitioner supported by any particular physical characteristics that Palmieri had noticed and which petitioner fit.

That the hearsay "was not necessary" to sustain Henry's conviction does not establish either that there was overwhelming evidence against him or that he was not prejudiced under the standard set forth in *Strickland* and *Kimmelman.* First, the hearsay included that, after picking up the case which Taylor threw out of the car, Henry passed the gun case to another individual who ran into the building, where it was later found. This was important because it both connected Henry to the building where the drugs were found and suggested a conscious effort by Henry to dispose of the drugs. No witness other than Palmieri was able to testify to Henry ever having handled the case after Taylor disposed of it out of Palmieri's car window. Even the trial judge apparently considered the evidence significant because he included it when he marshalled the evidence.

The failure to object to this hearsay regarding what the informant had said was exacerbated by the failure to request a missing witness charge as to the informant. Henry's counsel recognized the significance of the informant and argued that the jury should draw a negative inference against the prosecution for failing to call the informant as a witness. Counsel's inexplicable failure to request the missing witness charge to which Henry was entitled, coupled with his failure to object to the admission of the hearsay testimony, deprived Henry of a significant trial advantage. Where the trial judge, without objection, referred to that hearsay when marshalling the evidence, it cannot be said that counsel's argument for the inference was sufficient to ameliorate the absence of the charge.

Finally, the prosecutor's statement on summation regarding why the informant had not testified, while not alone sufficient to warrant a finding of prosecutorial misconduct requiring reversal, (*see* discussion above at page 19), was error which enhanced the impact of the other errors at trial regarding the confidential informant. In sum, I find that Henry has established the prejudice required by *Strickland.*[12]

---

12. In light of my conclusion as to the ineffectiveness of trial counsel, I do not address Henry's

Finally, I note that the constitutional error in this case cannot be treated as harmless because, as the Supreme Court has recently held, the *Strickland* standard of prejudice "necessarily entails the conclusion that the suppression must have had 'substantial and injurious effect or influence in determining the jury's verdict,' *Brecht v. Abrahamson*, 507 U.S. 619, ——, 113 S.Ct. 1710, 1712, 123 L.Ed.2d 353 (1993) quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)." *Kyles v. Whitley*, —— U.S. ——, ——, 115 S.Ct. 1555, 1566–67, 131 L.Ed.2d 490 (April 19, 1995).

### *CONCLUSION*

The petition for a writ of habeas corpus should be granted, unless, within 90 days of the adoption of this Report, the People retry the defendant.

Copies of this report are being mailed today to counsel for petitioner and respondent who are hereby put on notice that any objections to this report must be made, with a copy to me, in conformity with 28 U.S.C. § 636(b)(1) and Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts, which provide that a party may serve and file specific written objections to the proposed findings and recommendations within ten (10) days after being served with a copy of this report. *See* Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure regarding computation of time. A party that fails to file timely objections waives the right to further judicial review, including appellate review, of the decision. *Small v. Secretary of HHS*, 892 F.2d 15, 16 (2d Cir.1989). *See Thomas v. Arn*, 474 U.S. 140, 148–53, 106 S.Ct. 466, 471, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir.1988). Any requests for extensions of time to file objections should be made to Judge Wood.

Dated: New York, New York

April 24, 1995.

additional claim that his appellate counsel was also ineffective.