******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

BRYAN JORDAN *v.* COMMISSIONER
OF CORRECTION
(SC 20485)

Robinson, C. J., and McDonald, D'Auria,
Kahn, Ecker and Keller, Js.

*Syllabus*

The petitioner, who had been convicted of manslaughter in the first degree
with a firearm in connection with the shooting death of the victim,
sought a writ of habeas corpus, claiming that his criminal trial counsel,
P, had provided ineffective assistance insofar as she failed to conduct
a proper investigation, to present available evidence supporting his self-
defense claim, and to raise a third-party culpability defense. On the day
of the shooting, the petitioner was arguing with the victim. Certain
individuals who witnessed the incident agreed that an initial gunshot
was fired by someone other than the petitioner or the victim. Several
witnesses then saw the petitioner pull out a gun and fire in the direction
of the victim. The petitioner fled the scene, and the witnesses heard
more gunshots. At the habeas trial, the habeas court heard testimony
from the petitioner, as well as eight witnesses, including six individuals,
A, X, Y, J, W and R, who witnessed the events surrounding the shooting
but who were not called by P to testify during the petitioner's criminal
trial. A was the petitioner's sister, X was A's daughter and the petitioner's
niece, Y was the sister to A and the petitioner, J was a friend of the
petitioner and the victim, W was a close friend of the victim, and R was
an acquaintance of both the petitioner and the victim. The court did
not hear testimony from P because she had died prior to the habeas
trial. The habeas court rendered judgment granting the habeas petition,
reasoning that P's failure to call A, X, Y, J, W and R to testify at the
petitioner's criminal trial prejudiced him by unduly diminishing his con-
stitutional right to present a defense. On the granting of certification,
the respondent appealed to the Appellate Court, which reversed the
habeas court's judgment, concluding that the petitioner had not provided
sufficient evidence to rebut the strong presumption that P had exercised
her reasonable, professional judgment. On the granting of certification,
the petitioner appealed to this court. *Held*:

1. This court clarified that, in cases such as the present one, in which the
attorney who allegedly provided ineffective assistance is unavailable to
testify at the petitioner's habeas trial, the framework of the inquiry into
counsel's performance is not altered merely because of that unavailabil-
ity, and the Appellate Court in the present case placed undue emphasis
on the petitioner's failure to present P's testimony, as the petitioner's
claim regarding P's performance turned on the objective reasonableness
of the possible strategic reasons that P might have had rather than on
P's subjective state of mind; moreover, this court's plenary review of
the petitioner's ineffective assistance claims required it to examine the
record of his criminal trial in the absence of P's testimony, as that record
served as an informative window through which this court could identify
P's possible strategic reasons and consider the objective reasonableness
of those reasons, and such an approach was consistent with that taken
in Connecticut and federal case law; furthermore, a habeas court's
inquiry into the reasonableness of counsel's actions is not limited to a
review of the criminal trial record, although the habeas court's evaluation
of counsel's performance should begin with a thorough review of that
record, as a court's conclusion is strong when it is based in evidence
divined from the record, and when the criminal trial record does not
reveal the reasons for counsel's decisions, the habeas court is required
to affirmatively entertain other possible reasons and to rely on the
presumption of reasonable, professional assistance.

2. The petitioner could not prevail on his claim that P's performance was
constitutionally deficient on the ground that she had failed to adequately
investigate and to call six eyewitnesses whose testimony would have
supported his self-defense claim: P's failure to investigate X and Y was
objectively reasonable, as P reasonably might have declined to investi-

gate them given that their potential bias as close family to the petitioner might have undermined their credibility, that they were young at the time of the shooting, and that their testimony did not directly support a claim of self-defense; moreover, P's decision not to call A and J was objectively reasonable, as A's testimony did not directly support a claim of self-defense, P reasonably could have concluded that A's bias as the petitioner's sister might have undermined her credibility such that the damaging effect of her testimony would have outweighed its benefit, and the criminal trial record strongly supported the possibility that P made a strategic decision not to call J so that P would have a stronger basis on which to attack the sufficiency of the state's evidence regarding the requisite intent to commit murder, even though such a decision might have weakened the petitioner's self-defense claim; furthermore, irrespective of P's performance with respect to W and R, her failure to investigate or to call them as witnesses did not prejudice the petitioner, as this court could not conclude that there was a reasonable probability that the result of the petitioner's criminal trial would have been different if P had called W or R to testify in light of the facts that their testimony that the victim had a gun at the scene was duplicative of the testimony of the state's key witnesses at the petitioner's criminal trial, that W's testimony would have contradicted the petitioner's criminal trial testimony regarding a critical fact, and that R observed the shooting from a distance and could not identify the individuals who were present at the scene.

3. There was no merit to the petitioner's claim that P's performance was constitutionally deficient on the ground that P had unreasonably failed to raise a third-party culpability defense as a result of her inadequate investigation and decision not to call J and W as witnesses at the criminal trial; although J's and W's testimony that the victim's brother, K, fired his gun and the medical examiner's testimony regarding the path through which the bullet travelled after entering the victim's body may have supported an inference that the fatal gunshot was fired by K, not the petitioner, P reasonably may have believed that the third-party culpability defense was weaker than the petitioner's self-defense claim because the state had strong evidence to counter a third-party culpability narrative, as all of the witnesses testified that the victim did not fall to the ground until after the petitioner fired his gun, suggesting it was the petitioner's shot, and not the first shot fired, that struck and killed the victim.

Argued May 3—officially released November 5, 2021*

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Kwak, J.*; judgment granting the petition, from which the respondent, on the granting of certification, appealed to the Appellate Court, *Lavine, Prescott* and *Sheldon, Js.*, which reversed the habeas court's judgment and remanded the case with direction to deny the petition, and the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Daniel J. Krisch*, assigned counsel, for the appellant (petitioner).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *Rebecca A. Barry*, supervisory assistant state's attorney, for the appellee (respondent).

*Opinion*

McDONALD, J. This certified appeal requires us to consider how a habeas petitioner may satisfy his burden to establish a claim of ineffective assistance of counsel under *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), when the allegedly ineffective counsel has died prior to the habeas trial. The petitioner, Bryan Jordan, was engaged in an argument with the victim, Curtis Hannons, when an initial gunshot fired from elsewhere prompted the petitioner to pull out his gun and fire it once at the victim's head. The petitioner was convicted of manslaughter in the first degree, in addition to another crime, and sentenced to forty-five years of imprisonment, and he thereafter filed a petition for a writ of habeas corpus on the basis of ineffective assistance of his trial counsel. The habeas court granted the petition for a writ of habeas corpus, reasoning that trial counsel's failure to call six additional eyewitnesses to testify at the underlying criminal trial prejudiced the petitioner's defense. The Appellate Court subsequently reversed the habeas court's judgment on the ground that the petitioner, as a consequence of his trial counsel's death, had not provided sufficient evidence to rebut the strong presumption that his trial counsel had exercised her reasonable professional judgment. *Jordan* v. *Commissioner of Correction*, 197 Conn. App. 822, 871–72, 234 A.3d 78 (2020). On appeal to this court, the petitioner claims that the Appellate Court's standard places an insurmountable obstacle in the path of a habeas petitioner whose trial counsel is unavailable to testify. For the following reasons, we clarify the applicable standard and conclude that the petitioner has failed to satisfy the *Strickland* test with respect to either claim of ineffective assistance of counsel.

The Appellate Court's decision affirming the petitioner's conviction on direct appeal sets forth the facts and procedural history; *State* v. *Jordan*, 117 Conn. App. 160, 161–62, 978 A.2d 150, cert. denied, 294 Conn. 904, 982 A.2d 648 (2009); which we summarize in relevant part. On the day of the shooting, the petitioner was in an argument with the victim and the victim's brother, Jason Kelly. The argument ended when the petitioner got into his car and drove away. A few minutes later, the petitioner returned, and another heated discussion took place between the petitioner and the victim. Several people congregated around the petitioner and the victim, attempting to calm them down.

The eyewitnesses gave varying accounts of precisely what happened next. All agreed, however, that an initial gunshot was fired by someone other than the petitioner or the victim. Several witnesses then saw the petitioner pull out a gun and fire it once in the direction of the victim's head. The petitioner fled on foot, and the witnesses heard several more gunshots. The victim was

transported to a hospital, where he died.

The petitioner was arrested and charged with murder in violation of General Statutes § 53a-54a (a), as well as several lesser included offenses.[1] The petitioner asserted a claim of self-defense. Id., 170. The jury ultimately found the petitioner not guilty of murder but guilty of manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a (a). Id., 162. The trial court sentenced the petitioner to the maximum permitted sentence of forty years of imprisonment with respect to this charge. *Jordan* v. *Commissioner of Correction*, supra, 197 Conn. App. 824 n.1. The Appellate Court affirmed the petitioner's conviction on direct appeal. *State* v. *Jordan*, supra, 117 Conn. App. 172.

The Appellate Court's decision reversing the habeas court's judgment in the present case sets forth additional facts and procedural history pertaining to the habeas proceeding; *Jordan* v. *Commissioner of Correction*, supra, 197 Conn. App. 824–28; which we summarize in relevant part. The petitioner filed the present amended petition for a writ of habeas corpus against the respondent, the Commissioner of Correction, in 2015. The petition raised, in relevant part, two claims of ineffective assistance of trial counsel in violation of the United States and Connecticut constitutions. Specifically, the petitioner first alleged that his criminal trial counsel, Diane Polan, failed to conduct a proper investigation and failed to present available evidence supporting his self-defense claim. The petitioner also alleged that Polan failed to raise a third-party culpability defense as a result of the same improper investigation and failure to present available evidence.

The habeas court, *Kwak, J.*, conducted a trial and heard testimony from the petitioner, as well as eight witnesses called on his behalf, including Polan's private investigator, an attorney testifying as an expert on professional standards, and six individuals who witnessed the events surrounding the shooting but were not called by Polan to testify during the criminal trial. The court did not hear testimony from Polan because she had died prior to the habeas trial. The court subsequently granted the petition for a writ of habeas corpus on the basis of both claims of ineffective assistance of counsel. Specifically, the court determined that "the petitioner had met his burden of demonstrating that Polan had rendered constitutionally deficient performance by failing to investigate properly or to present available evidence in support of the petitioner's claim of self-defense and by failing properly to investigate, raise, or present evidence in support of a third-party culpability defense." Id., 828. The court further determined that the petitioner had met his burden of demonstrating that Polan's deficient performance "had prejudiced him by unduly diminishing his due process right to establish a defense." Id.

The Appellate Court reversed the judgment of the

habeas court with respect to both claims of ineffective assistance of counsel. Id., 872. The court emphasized that, because Polan was unavailable to testify at the habeas trial, the petitioner had not met his burden of establishing how her investigative efforts were inadequate. Id., 848. Likewise, the court reasoned that the petitioner had not met his burden of disproving the objective reasonableness of any strategic reasons Polan might have had for her decisions regarding the investigation, which witnesses to call, and the potential third-party culpability defense. Id. The court then considered the testimony of the habeas witnesses at length and concluded that the petitioner failed to demonstrate that Polan's performance had been deficient with respect to either claim of constitutionally ineffective assistance. Id., 860, 871.

Thereafter, the petitioner filed a petition for certification to appeal, which we granted, limited to the following issue: "Did the Appellate Court properly reverse the habeas court's determination that the performance of the petitioner's criminal trial counsel fell outside the range of competent counsel under *Strickland* v. *Washington*, [supra, 466 U.S. 668]?" *Jordan* v. *Commissioner of Correction*, 335 Conn. 931, 236 A.3d 218 (2020).

On appeal, the petitioner contends that the Appellate Court applied an incorrect standard to his claims of ineffective assistance of counsel. Specifically, the petitioner contends that the habeas court required him to negate every " 'plausible' " reason Polan might have had for her failure to investigate and call six witnesses with respect to his self-defense claim, as well as her failure to raise a third-party culpability defense that would have been supported by those same witnesses. With respect to his first claim of ineffective assistance, the petitioner asserts that Polan's failure to investigate the six witnesses who observed the events surrounding the shooting and to call them to support his self-defense claim constituted objectively unreasonable representation. With respect to his second claim of ineffective assistance, the petitioner asserts that Polan's failure to investigate and to call the same witnesses, as well as her failure to raise a claim of third-party culpability supported by those witnesses, was objectively unreasonable. The respondent disagrees, contending that the Appellate Court properly applied the strong presumption of reasonable competence and concluded that the petitioner had failed to meet his heavy burden of overcoming that presumption with respect to either claim of constitutionally ineffective assistance.

I

We begin with the standard of review and principles of law that govern the petitioner's claims. "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . [In addition], [t]he

habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Citations omitted; internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 677, 51 A.3d 948 (2012).

The sixth and fourteenth amendments to the United States constitution, as well as article first, § 8, of the Connecticut constitution, guarantee a criminal defendant the assistance of counsel for his or her defense. See U.S. Const., amend. VI; Conn. Const., art. I, § 8. "It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . . A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment." (Citation omitted; internal quotation marks omitted.) *Ledbetter* v. *Commissioner of Correction*, 275 Conn. 451, 458, 880 A.2d 160 (2005), cert. denied sub nom. *Ledbetter* v. *Lantz*, 546 U.S. 1187, 126 S. Ct. 1368, 164 L. Ed. 2d 77 (2006). "When a [habeas petitioner] complains of the ineffectiveness of [trial] counsel's assistance, the [petitioner] must show that counsel's representation fell below an objective standard of reasonableness." *Strickland* v. *Washington*, supra, 466 U.S. 687–88. "In other words, the petitioner must demonstrate that [trial counsel's] [performance] was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law." (Internal quotation marks omitted.) *Ledbetter* v. *Commissioner of Correction*, supra, 460. Moreover, "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland* v. *Washington*, supra, 688.

"To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *Ledbetter* v. *Commissioner of Correction*, supra, 275 Conn. 458. "[T]he question is whether there is a reasonable probability that, [without] the errors, the [fact finder] would have had a reasonable doubt respecting [the petitioner's] guilt." *Strickland* v. *Washington*, supra, 466 U.S. 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., 694. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. . . . Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering

the entire evidentiary picture, and some will have had an isolated, trivial effect." Id., 695–96. "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." Id., 696. "Although a petitioner can succeed only if he satisfies both prongs, a reviewing court can find against a petitioner on either ground." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 330 Conn. 520, 538, 198 A.3d 52 (2019).

Our analysis of the petitioner's claims focuses largely on Polan's performance. The United States Supreme Court has elaborated further principles that inform this prong of the *Strickland* test. "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a [petitioner] to second-guess [trial] counsel's assistance after conviction . . . and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action *might be considered sound trial strategy*." (Citation omitted; emphasis added; internal quotation marks omitted.) *Strickland* v. *Washington*, supra, 466 U.S. 689.

In a typical habeas trial for a claim of ineffective assistance, the petitioner's criminal trial counsel would testify about whether the challenged action was part of a strategic decision or litigation tactic, rather than a result of inadvertence or "sheer neglect." (Internal quotation marks omitted.) *Harrington* v. *Richter*, 562 U.S. 86, 109, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011); see, e.g., id. ("[t]here is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect' "); *Henry* v. *Scully*, 918 F. Supp. 693, 715 (S.D.N.Y. 1995) ("[n]ormally, before finding counsel inadequate, an evidentiary hearing would be held" to determine whether counsel's action was "strategic, that is, that it represented a conscious decision on counsel's part"), aff'd, 78 F.3d 51 (2d Cir. 1996); *Spearman* v. *Commissioner of Correction*, 164 Conn. App. 530, 553, 138 A.3d 378 (noting that petitioner conceded that trial counsel's decision was "a matter of strategy made at trial" and then considering "whether this strategic decision was reasonable"), cert. denied, 321 Conn. 923, 138 A.3d 284 (2016). Assuming the habeas court finds testimony regarding trial counsel's strategy credible, the petitioner

would then attempt to overcome the strong presumption that the asserted strategy was objectively reasonable. See, e.g., *Harrington* v. *Richter*, supra, 104; *Strickland* v. *Washington*, supra, 466 U.S. 689.

Neither this court nor the United States Supreme Court has considered how a habeas petitioner may satisfy his or her burden under *Strickland* when the allegedly ineffective trial counsel has died or is otherwise unavailable to testify at the habeas trial. However, based on the nature of the performance prong of *Strickland*, we begin by noting that the framework of that inquiry is not significantly altered by the unavailability of the allegedly ineffective counsel. As the United States Supreme Court has observed, *Strickland* "calls for an inquiry into the *objective reasonableness* of counsel's performance, not counsel's subjective state of mind." (Emphasis added.) *Harrington* v. *Richter*, supra, 562 U.S. 110. As a result, the habeas court cannot "insist counsel confirm every aspect of the strategic basis for his or her actions." Id., 109. Likewise, trial counsel's testimony may identify specific strategic or tactical reasons counsel had for the challenged action, but the habeas court is not confined to consider only those reasons identified. Rather, in all circumstances, the strong presumption of *Strickland* that counsel exercised reasonable professional judgment requires the habeas court "to affirmatively entertain the range of possible reasons" trial counsel might have had for the challenged action. (Internal quotation marks omitted.) *Cullen* v. *Pinholster*, 563 U.S. 170, 196, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011). Given the court's obligation affirmatively to contemplate possible strategic reasons for the challenged action, the strategic reasons identified by counsel's habeas testimony do not necessarily restrict or resolve the *Strickland* inquiry. Accordingly, when trial counsel is not available to testify, the absence of such testimony does not alter the relevant inquiry. In that circumstance, as always, the court must contemplate the possible strategic reasons that might have supported the challenged action and then consider whether those reasons were objectively reasonable. See, e.g., id.; *Strickland* v. *Washington*, supra, 466 U.S. 689.

In applying *Strickland* and its progeny to the context of unavailable counsel, the Appellate Court in this case placed undue emphasis on the petitioner's failure to present testimony by his deceased attorney, reasoning that this failure was effectively fatal to his claim: "[S]pecific evidence of Polan's reasons for pursuing or not pursuing any particular defense strategy—something generally obtained at the habeas trial through the testimony of trial counsel or someone directly familiar with her strategy—was utterly lacking. Ordinarily, such evidence is crucial to meet the high hurdle imposed on a petitioner to show that his counsel's exercise of professional judgment fell outside the wide range considered

competent for constitutional purposes." *Jordan* v. *Commissioner of Correction*, supra, 197 Conn. App. 870–71; see also id., 871 ("the petitioner was unable, *due to a lack of evidence*, to negate all possibility that Polan engaged in a reasonable . . . defense strategy" (emphasis added)). As we noted, however, the performance prong of *Strickland* "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington* v. *Richter*, supra, 562 U.S. 110. In other words, the petitioner's claim turned on the objective reasonableness of the possible strategic reasons Polan might have had and that the habeas court was required affirmatively to consider. Evidence regarding whether Polan actually, subjectively made the challenged decisions based on those reasons—evidence that was lacking by virtue of Polan's death, and that the Appellate Court indicated was "crucial" to the petitioner's claim; *Jordan* v. *Commissioner of Correction*, supra, 871—would not have addressed the relevant inquiry, which was *objective* reasonableness. As the petitioner in this case persuasively contends, requiring every habeas petitioner, whose allegedly ineffective trial counsel is unavailable to testify at the habeas trial, to provide evidence of counsel's *subjective* state of mind would undoubtedly and impermissibly heighten the petitioner's burden under *Strickland*.

In sum, our plenary review requires us, first, affirmatively to contemplate the possible strategic reasons that might have supported Polan's decisions regarding investigating witnesses, calling witnesses, and presenting third-party culpability, and, second, to consider whether those reasons were objectively reasonable.[2] See, e.g., *Cullen* v. *Pinholster*, supra, 563 U.S. 196; *Strickland* v. *Washington*, supra, 466 U.S. 689. In order affirmatively to contemplate possible strategic reasons for Polan's actions, we begin by examining the record of the petitioner's criminal trial. See, e.g., *Franko* v. *Commissioner of Correction*, 165 Conn. App. 505, 519–20, 139 A.3d 798 (2016). In the absence of testimony by trial counsel, the record of the underlying proceeding serves as an informative window into the representation alleged to have been ineffective, allowing the reviewing court to identify possible strategic reasons, consider the objective reasonableness of those reasons, and firmly ground its ultimate conclusion.

This approach is consistent with the Connecticut cases and federal court cases that have considered this circumstance. For example, in *Franko*, a habeas petitioner claimed ineffective assistance regarding a jury instruction issue, and trial counsel was unavailable to testify at the habeas proceeding. Id., 509, 515. The Appellate Court reasoned that, "[l]acking the ability to determine directly the reasons for trial counsel's actions, courts must examine all other available evidence from the trial record in order to determine

whether the conduct complained of might be considered sound trial strategy." Id., 519. In doing so, the court found objectively reasonable, strategic reasons for trial counsel's actions contained in the transcript of his closing argument. Id., 522–24. In addition, in *Bullock* v. *Whitley*, 53 F.3d 697 (5th Cir. 1995), a habeas petitioner claimed ineffective assistance regarding trial counsel's preparation for an alternative defense. Id., 700. The Fifth Circuit emphasized that, although trial counsel was deceased at the time of the habeas trial, his testimony was "not necessary to [the court's] determination that [counsel's] decision might be considered sound trial strategy." Id., 701. After reviewing the criminal trial record, the court concluded that trial counsel was prepared and made objectively reasonable decisions regarding a difficult case. See id., 701 n.11 ("[a]lthough there was no opportunity to obtain [trial counsel's] testimony regarding his motivations, our review of the record has left us with the distinct impression that [counsel] did the best he could with what he had"). Finally, in *Henry* v. *Scully*, supra, 918 F. Supp. 693, a habeas petitioner claimed ineffective assistance because his criminal trial counsel failed to request a jury instruction that a codefendant's confession could be used only against the codefendant and not against the petitioner. Id., 714. In granting the habeas petition, the United States District Court for the Southern District of New York reasoned that, even accepting that the criminal trial record supported the argument that trial counsel's decisions were based on a strategy of presenting a joint defense for the two codefendants, such strategy was not objectively reasonable under *Strickland*. Id., 715. These cases demonstrate that, irrespective of the merits of a habeas petition, in the absence of trial counsel's testimony, a reviewing court finds the strongest foundation for the outcome of the petition in the record of the underlying proceeding.

Regardless of the availability of trial counsel to testify at the habeas proceeding, the habeas court's inquiry into the reasonableness of counsel's actions is not *limited* to a review of the criminal trial record. See *Cullen* v. *Pinholster*, supra, 563 U.S. 196 (court must "affirmatively entertain the range of possible reasons" counsel might have had for challenged action (internal quotation marks omitted)); *Moye* v. *Commissioner of Correction*, 168 Conn. App. 207, 222, 145 A.3d 362 (2016) (trial counsel's action was objectively reasonable despite record containing "little or no circumstantial evidence from which the habeas court could have divined" counsel's reasons), cert. denied, 324 Conn. 905, 153 A.3d 653 (2017). We emphasize, however, that a habeas court's evaluation of an ineffective assistance claim in a circumstance of unavailable trial counsel ought to begin with a thorough review of the record of the underlying proceeding because, as the cases that have considered this circumstance demonstrate, the court's conclusion is

surely *strongest* when it is based in evidence divined from that record. See, e.g., *Bullock* v. *Whitley*, supra, 53 F.3d 701; *Henry* v. *Scully*, supra, 918 F. Supp. 715; *Franko* v. *Commissioner of Correction*, supra, 165 Conn. App. 520. Grounding the court's reasoning in the record maintains the ideal balance between the court's responsibility affirmatively to entertain possible strategic reasons and its obligation to avoid "[indulging] post hoc rationalization for counsel's [decision-making] *that contradicts the available evidence of counsel's actions* . . . ." (Emphasis added; internal quotation marks omitted.) *Harrington* v. *Richter*, supra, 562 U.S. 109; see also *Franko* v. *Commissioner of Correction*, supra, 520 (reviewing court "should not speculate as to trial counsel's reasons for making [litigation] decisions"). Likewise, beginning the court's analysis with a thorough review of the record best maintains the original *Strickland* burdens in the absence of counsel's testimony, without unfairly prejudicing either the petitioner or the respondent. Compare *Slevin* v. *United States*, 71 F. Supp. 2d 348, 358 n.9 (S.D.N.Y. 1999) (recognizing that "the death of a petitioner's trial counsel is just as, if not more, likely to prejudice the respondent"), aff'd, 234 F.3d 1263 (2d Cir. 2000), with *Jordan* v. *Commissioner of Correction*, supra, 197 Conn. App. 871 (recognizing that "the death of counsel . . . made the petitioner's case more difficult to prove than it might otherwise have been"). That said, we recognize that the record of the underlying proceeding may not always reveal the reasons for counsel's decisions, in which case the court will be required affirmatively to entertain other possible reasons and to rely on the presumption of reasonable professional assistance. See *Moye* v. *Commissioner of Correction*, supra, 222.

## II

We now turn to the petitioner's claim of ineffective assistance of counsel with respect to his self-defense claim. Specifically, the petitioner contends that Polan's performance was constitutionally deficient because she failed to adequately investigate and to call six witnesses whose testimony would have supported his self-defense claim. The respondent disagrees, contending that the petitioner cannot overcome *Strickland*'s strong presumption of reasonable competence because decisions about which witnesses to call are quintessential trial strategy decisions entitled to great deference.

The substantive principles governing a self-defense claim are well settled. "Pursuant to [General Statutes] § 53a-19 (a) . . . a person may justifiably use deadly physical force in self-defense only if he reasonably believes both that (1) his attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, and (2) that deadly physical force is necessary to repel such attack." (Footnote omitted; internal quotation marks omitted.) *State*

v. *Saunders*, 267 Conn. 363, 372–73, 838 A.2d 186, cert. denied, 541 U.S. 1036, 124 S. Ct. 2113, 158 L. Ed. 2d 722 (2004). We repeatedly have stated that the second requirement is "subjective-objective," meaning that it requires the jury to "make two separate affirmative determinations . . . . First, the jury must determine whether, on the basis of all of the evidence presented, the defendant in fact had believed that he had needed to use deadly physical force, as opposed to some lesser degree of force, in order to repel the victim's alleged attack. . . . If . . . the jury determines that the defendant in fact had believed that the use of deadly force was necessary, the jury must make a further determination as to whether that belief was reasonable, from the perspective of a reasonable person in the defendant's circumstances. . . . Thus, if a jury determines that the defendant's honest belief that he had needed to use deadly force, instead of some lesser degree of force, was not a reasonable belief, the defendant is not entitled to the protection of § 53a-19."[3] (Internal quotation marks omitted.) Id., 373–74.

A

The following additional facts and procedural history are relevant to our resolution of this claim, reflecting our examination of the petitioner's underlying criminal trial record to divine possible strategic reasons that might have supported Polan's investigative and trial decisions. In the petitioner's criminal trial, the state relied on several eyewitnesses. Relevant to this appeal, one eyewitness, Roger B. Williams, Sr., lived in the neighborhood where the shooting took place, knew both the petitioner and the victim, and testified that he was present for the entire incident. *Jordan* v. *Commissioner of Correction*, supra, 197 Conn. App. 840. Williams testified that the victim drew his gun during the argument, before the petitioner drew his. Id., 841. Williams also indicated that one of the petitioner's habeas witnesses had fired the initial gunshot, at which point the petitioner drew a gun and fired it at the victim's head. Id. In addition, the state called Kimberly Stevenson, the victim's girlfriend and the mother of their children, who witnessed the shooting from her bedroom window. Id. She testified that, although she heard the initial gunshot, she did not see who fired it, and that the petitioner subsequently drew a gun and fired it at the victim's head. Id. Stevenson also testified that she had not seen the victim with a gun during the afternoon leading up to the shooting. Id. Williams and Stevenson both testified that Kelly, the victim's brother, was not present at the shooting. Id., 841–42. At the state's request, the trial court admitted a recorded statement, given by a third eyewitness to the police while he was in custody on unrelated charges, that generally corroborated Williams' and Stevenson's accounts. Id., 842. Finally, the state called two police officers who responded to the scene shortly after the shooting; id., 843; and a

detective who testified about his efforts to investigate the shooting and to locate the petitioner. Id., 826.

The petitioner testified on his own behalf at his criminal trial. Specifically, he testified that he did not know whether the victim had a gun, but he had "observed [the victim] fumbling with his pocket in a way that suggested he might be armed." Id., 843. The petitioner testified that he likewise believed that Kelly had a gun. Id. He further testified that he drew his gun only in response to the first gunshot and that he fired in the direction of the victim because he believed the first gunshot had been fired from that direction. Id. On cross-examination, the petitioner testified that he was not in constant possession of his gun throughout the day and that he sometimes left his gun in the glove compartment of his car. Id., 844. Finally, the medical examiner who performed the autopsy of the victim testified regarding the nature, location, and trajectory of the victim's bullet wound. Id.

Polan's cross-examination of the state's witnesses as well as her closing argument demonstrate that her overall trial strategy was based on three related theories of the case. First, Polan highlighted the reasonable doubt that the bullet from the petitioner's gun was the one that actually killed the victim, relying on the eyewitness' testimony that the petitioner had been standing directly in front of the victim and the medical examiner's testimony regarding the leftward and upward path of the bullet wound. Id., 844–45. Second, Polan highlighted the reasonable doubt that the petitioner ever developed the specific intent required for the various charges, relying on the eyewitness' conflicting accounts about what had happened, as well as the consistent testimony about the rapid pace of events. Id., 845–46. Third, Polan presented evidence in support of the petitioner's self-defense claim, relying on the eyewitness' testimony regarding the initial gunshot, the possibility that the victim and others in the vicinity were armed, and the fact that the petitioner did not fire until fired at. Id. Polan ended her closing argument by focusing on the second and third theories: "This is a tragic killing, it's a tragedy that [the victim] is . . . not with us today, but it's not a murder. It's not a murder because the state cannot prove the specific intent to kill beyond a reasonable doubt, and, again, there is ample evidence here that [the petitioner] acted in self-defense. He was shot at [and] didn't know where the shots were coming from. It all happened so quickly that he did not form a specific intent to kill [the victim]. Yes, he shot in [the victim's] direction; he told you that when he testified here yesterday, but his intent was not to kill [the victim]. [The petitioner's] intent was to protect himself." (Internal quotation marks omitted.) Id., 846.

We next consider the record of the habeas trial, beginning with the six witnesses whom, the petitioner con-

tends, Polan should have called to testify about the events surrounding the shooting. Three witnesses were closely related to the petitioner and to each other: Audrey Jordan, the petitioner's sister; Alexis Jordan, Audrey's daughter and the petitioner's niece; and Jymisha Freeman, sister to Audrey and the petitioner. Audrey testified that she was inside her mother's house when she heard gunshots. She went outside, saw a body on the ground, and walked forward to hug Stevenson where she knelt beside the victim's body. Audrey testified that she observed Stevenson jump up, run inside her nearby house, and come back to the scene with a towel. Stevenson used the towel to pick up a gun lying inches from the victim's body, carried it back inside her house, and then returned to the scene without the gun or the towel. Audrey also testified that she spoke with the state's detective and Polan about what she had observed.

Alexis was about eight years old and Jymisha was about eleven years old at the time of the incident. Both witnesses testified that they were inside the same house as Audrey when they heard gunshots and went outside. Alexis saw the victim's body and a gun lying a few inches from it; Jymisha could not identify the victim, and she did not see a gun from her farther distance. Alexis corroborated Audrey's testimony that Stevenson wrapped a gun in a cloth and carried it from near the victim's body into her house. Likewise, Jymisha testified that she saw Stevenson at the scene with a white towel or cloth in her hand. Neither witness spoke with Polan, her private investigator, or the police about the incident.

Flonda Jones also testified at the habeas trial; she had provided a written statement to Polan's private investigator dated approximately nine months after the incident, which was admitted into evidence at the habeas trial. She was a friend of both the petitioner and the victim, and she witnessed the two confrontations between them, including the shooting. Jones stated that, as the petitioner was leaving the first confrontation and walking to his car, he said to the victim: "You going to confront me with a gun." She stated that the petitioner subsequently returned, and the victim resumed his argument with the petitioner. Throughout this confrontation, Jones observed the victim reaching for a gun in his waistband multiple times. In both her written statement and her testimony at the habeas trial, Jones stated that Kelly fired the initial gunshot from where he stood next to and slightly behind the victim.

Then, according to Jones' written statement, the victim and the petitioner both pulled guns from their waistbands. The petitioner fired his gun, the victim fell to the ground, and the petitioner began running away. Jones' testimony at the habeas trial diverges from her written statement with respect to who fired the gunshot that killed the victim. When confronted with her written

statement on cross-examination, however, Jones testified that the written statement "sounds about right." She further testified that she saw a gun fall out of the victim's waistband when he fell. Jones also corroborated Audrey's and Alexis' testimony that Stevenson wrapped the gun in a cloth and carried it into her house. Jones testified that she spoke with the police and Polan's private investigator about the incident and that she was subpoenaed for the petitioner's criminal trial but not called to testify.

James Walker, a close friend of the victim, also testified at the habeas trial. Walker was Kelly's cousin, and he indicated that he, Kelly, and the victim grew up together. Walker testified that he saw the "heated discussion" between the petitioner and the victim and observed the victim "flashing" the gun at his waistband but that the victim never actually drew his weapon. He testified that he saw Kelly standing behind the victim on the steps of a nearby building throughout the confrontation. Walker testified that he turned away from the petitioner and the victim and then heard a gunshot. When he turned back around, he saw that the victim was on the ground and that Kelly was firing his gun from his place on the steps. Walker testified that he fled but returned a few minutes later to see Stevenson and Williams next to the victim's body. He saw Williams remove something wrapped in a towel from the scene, but he did not know what. Walker testified that he spoke with the state's detective about what he had observed, but he did not speak with Polan or her private investigator. Finally, in response to questions seeking to impeach his credibility, Walker testified that he did not intend to testify in support of the petitioner because he was "loyal" to the victim.

The sixth witness to testify at the habeas trial was Billy Wright. He indicated that he knew both the petitioner and the victim. He was seventeen at the time of the incident, and he testified that he was at a playground when he saw the victim on a nearby porch talking to someone he could not identify. Wright testified that he saw the victim pull a gun from his waistband, at which point he decided to leave the playground to get away from the incident. He heard gunshots as he was leaving, but he did not see who fired them because his back was turned, and he did not see anything else from the incident or anyone else whom he recognized. Wright denied Williams' testimony from the petitioner's criminal trial that Wright had a gun during the incident and that he fired the initial gunshot. He also testified that he spoke with the state's detective about the incident. The habeas court found all six of these witnesses credible.

The petitioner testified at the habeas trial regarding Polan's trial preparation. He testified that he told Polan the names of certain witnesses to the incident, including

Jymisha, Jones, Walker, and Wright, and that Polan had subpoenaed Audrey. Polan informed the petitioner about Jones' written statement and explained that, given Jones' anticipated testimony, she intended to raise a self-defense claim. Specifically, the petitioner testified that, "[w]hen I elected to go to trial, I went to the trial under the premise that we were—it was a self-defense case based on the testimony of [Jones]." The petitioner also testified that he asked Polan why she did not call Jones, but he could not recall the reason Polan provided. He further testified that, when Polan indicated to the petitioner that he would testify, he asked her, "why won't you call the witnesses, and she just said concentrate on what we're doing," which, at that time, had been preparing for the petitioner's own testimony. In addition, Mike O'Donnell, the private investigator who worked with Polan on the petitioner's criminal trial, testified at the habeas trial. O'Donnell testified that he "never discussed the witness list with [Polan]" and otherwise remembered almost nothing from his work on the petitioner's case, including any conversations with Jones.

B

In this appeal, the petitioner contends that, given the totality of the record from the underlying criminal trial and the habeas trial, it is clear that Polan had failed to conduct a proper investigation into the six witnesses to the incident. The petitioner further contends that Polan should have called those witnesses to support his self-defense claim. The petitioner asserts that those eyewitnesses were crucial to his self-defense claim because they would have established that the victim had a gun and was exhibiting threatening behavior toward him.

Because the petitioner's claims specifically challenge Polan's failure to investigate and to call certain witnesses, we note that we have articulated further principles, as has the United States Supreme Court, that inform our review of these specific challenged actions under *Strickland*. In the investigation context, "[i]nasmuch as [c]onstitutionally adequate assistance of counsel includes competent pretrial investigation . . . [e]ffective assistance of counsel imposes an obligation [on] the attorney to investigate all surrounding circumstances of the case and to explore all avenues that may potentially lead to facts relevant to the defense of the case." (Citation omitted; internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 680; see also *Skakel* v. *Commissioner of Correction*, 329 Conn. 1, 34, 188 A.3d 1 (2018), cert. denied, U.S. , 139 S. Ct. 788, 202 L. Ed. 2d 569 (2019). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable

precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland* v. *Washington*, supra, 466 U.S. 690–91; see also *Skakel* v. *Commissioner of Correction*, supra, 32. Regarding ineffectiveness claims relating to the failure to call witnesses, "[w]hen faced with the question of whether counsel performed deficiently by failing to call a certain witness, the question is whether this omission was objectively reasonable because there was a strategic reason not to offer such . . . testimony . . . [and] whether reasonable counsel could have concluded that the benefit of presenting [the witness' testimony] . . . was outweighed by any damaging effect it might have." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, supra, 330 Conn. 539. Moreover, "our habeas corpus jurisprudence reveals several scenarios in which courts will not second-guess defense counsel's decision not to investigate or call certain witnesses or to investigate potential defenses, such as when . . . counsel learns the substance of the witness' testimony and determines that calling that witness is unnecessary or potentially harmful to the case . . . ." (Footnotes omitted.) *Gaines* v. *Commissioner of Correction*, supra, 681–82.

On the basis of our review of the criminal and habeas trial records, we conclude that there were objectively reasonable, strategic reasons Polan might have had for her limited investigation and her decisions not to call certain habeas witnesses. Regarding Audrey, given that the habeas court credited her testimony that Polan subpoenaed her for the petitioner's criminal trial, it may reasonably be inferred that Polan knew the substance of Audrey's anticipated testimony. It may also reasonably be inferred that Polan knew that Audrey was the petitioner's sister. It is not unduly speculative and does not constitute impermissible post hoc rationalization to entertain the possibility that Polan concluded that Audrey's bias might have undermined her credibility enough that the damaging effect of her testimony would have outweighed its benefit. Under *Cullen*, it is our obligation to entertain reasonably possible reasons that may explain trial counsel's decisions, and it is not unduly speculative and does not constitute impermissible post hoc rationalization to entertain the possibility that Polan concluded that Audrey's bias might have undermined her credibility enough that the damaging effect of her testimony would have outweighed its benefit. Experienced trial lawyers know that simpler is often better and sometimes will decide not to call a witness because, in counsel's estimation, the marginal value to be gained from the expected testimony is not worth the risk that the jury will become distracted, confused or even doubtful about the theory of defense following an effective cross-examination of the witness. We cannot conclude that such a decision would have been objectively unreasonable. Indeed, we have previously

recognized that counsel's decision not to call a witness based on counsel's concern about the witness' potential bias as a family member of the habeas petitioner was objectively reasonable. See *Johnson* v. *Commissioner of Correction*, supra, 330 Conn. 552. We noted that this concern "was justified even if [the witness] was considered . . . credible . . . by the habeas court . . . ." Id. Moreover, given that Polan knew of Audrey, her decision not to call her at trial is "virtually unchallengeable . . . ." *Strickland* v. *Washington*, supra, 466 U.S. 690.

Regarding Alexis and Jymisha, nothing in the record supports an inference that Polan knew the substance of their anticipated testimony; rather, given that the habeas court credited their testimony that they never spoke with Polan or her investigator, it may reasonably be inferred that Polan did not contact either of them to learn the substance of their anticipated testimony.[4] Accordingly, Polan's decision not to investigate them will be considered objectively reasonable "to the extent that reasonable professional judgments support the limitations on [Polan's] investigation." Id., 691. However, as with Audrey, it may reasonably be inferred that Polan knew that Alexis and Jymisha were close family to the petitioner. It would have been reasonable for Polan to conclude that, as with the petitioner's sister, Audrey, their bias might have undermined their credibility. We cannot conclude that such a decision would have been objectively unreasonable. See, e.g., *Johnson* v. *Commissioner of Correction*, supra, 330 Conn. 552. Polan also reasonably might have declined to investigate Alexis and Jymisha given their young ages—eight and eleven years old, respectively, at the time of the shooting—which Polan likely would have learned from the petitioner or Audrey when they were first brought to Polan's attention.

We also emphasize, as the Appellate Court noted, that Alexis, Jymisha, and Audrey's testimony did not directly support a claim of self-defense. See *Jordan* v. *Commissioner of Correction*, supra, 197 Conn. App. 853. Their testimony tended to demonstrate only that a gun had been lying on the ground near the victim's body after he was shot, suggesting that it was the victim's gun and that he may have had it when he was shot. Id. Williams, the state's key eyewitness from the criminal trial, testified before the jury that the victim had drawn a gun prior to being shot. Thus, Polan reasonably could have concluded that Alexis, Jymisha, and Audrey's testimony was cumulative of, and not as compelling as, Williams' testimony. Consequently, we cannot conclude that any limitation on Polan's investigation of these witnesses would have been objectively unreasonable.

Turning to Polan's failure to call Jones at the criminal trial, we note that Jones' written statement to Polan's

private investigator, as well as her credible testimony that Polan subpoenaed her for the petitioner's criminal trial, strongly supports the inference that Polan knew the substance of Jones' anticipated testimony. See id., 855. The criminal trial record reveals an objectively reasonable reason Polan might have had to decline to call Jones: Although Jones' testimony would have supported the petitioner's self-defense claim, it also would have undermined Polan's efforts to inject reasonable doubt into the state's case regarding the petitioner's intent. Specifically, Jones' statement recited the petitioner's words to the victim, as the petitioner was leaving the first confrontation, "[y]ou going to confront me with a gun." Jones and the state's key eyewitness from the criminal trial, Williams, consistently described how the petitioner returned a few minutes after the end of the first confrontation, at which point the second confrontation and eventual shooting occurred. In addition, the criminal trial record contains testimony from the petitioner that he did not have possession of his gun at all times and that he sometimes left it in his car.

Together, this evidence would have strongly supported the state's argument that the petitioner possessed the requisite intent for murder because he left the first confrontation in order to acquire his gun and to resume his argument with the victim while armed. Without Jones' statement that the petitioner said, "[y]ou going to confront me with a gun" as he was leaving the first confrontation, the state's argument lacked direct evidence that the petitioner possessed the requisite intent for murder. In other words, the criminal trial record strongly supports the possibility that Polan decided not to call Jones so that she would have a stronger basis from which to attack the sufficiency of the state's evidence regarding the requisite intent to commit murder, even though such a decision might have weakened the petitioner's self-defense claim.[5] The jury ultimately found the petitioner not guilty of murder but guilty of the lesser included offense of manslaughter in the first degree with a firearm. Thus, it is reasonable to conclude that Polan's decisions, including her decision not to call Jones, contributed to the jury's decision to find the petitioner not guilty of the more serious charge. See, e.g., *Harrington* v. *Richter*, supra, 562 U.S. 111 ("while in some instances even an isolated error can support an [ineffective assistance] claim if it is sufficiently egregious and prejudicial . . . it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy" (citation omitted; internal quotation marks omitted)). As the Appellate Court noted, "[i]t is hard to label Polan's efforts on behalf of the petitioner as ineffective advocacy when those efforts resulted in a significant reduction in the petitioner's potential sentencing exposure through his acquittal on the murder charge. If the petitioner had been convicted of murder, he faced a

sentence ranging from the mandatory minimum of twenty-five years to a maximum of life in prison. See General Statutes § 53a-35a (2). Instead, his manslaughter with a firearm conviction carried a lesser penalty, a five year mandatory minimum with a maximum sentence of forty years of incarceration. General Statutes § 53a-35a (5)." *Jordan* v. *Commissioner of Correction*, supra, 197 Conn. App. 865.

We cannot conclude that the decision not to call Jones was objectively unreasonable. Given the strong support in the criminal trial record, this was a strategic decision made by Polan that, "although not entirely immune from review," is "entitled to substantial deference by the court." *Skakel* v. *Commissioner of Correction*, supra, 329 Conn. 31. This is precisely a circumstance in which the court should not "second-guess defense counsel's decision not to . . . call certain witnesses" because counsel "[learned] the substance of the witness' testimony and determin[ed] that calling that witness [was] unnecessary or potentially harmful to the case . . . ." (Footnotes omitted.) *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 681–82. As with Polan's decision not to call Audrey, this was a "strategic [choice] made after thorough investigation . . . [that is] virtually unchallengeable . . . ." *Strickland* v. *Washington*, supra, 466 U.S. 690. Moreover, counsel's decision regarding which defense theory to emphasize—attacking the sufficiency of the evidence supporting the state's case or buttressing a statutory defense—is a quintessential decision of trial strategy and professional judgment that *Strickland* considers to be objectively reasonable. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Id., 689. Accordingly, we conclude that Polan's decision not to call Jones did not constitute constitutionally deficient performance.

Regarding Walker and Wright, nothing in the record supports an inference that Polan knew the substance of their anticipated testimony. Given that the habeas court credited their testimony, it may reasonably be inferred that Polan did not contact either of them to learn the substance of their anticipated testimony. Accordingly, Polan's decision not to investigate them will be considered objectively reasonable "to the extent that reasonable professional judgments support the limitations on [Polan's] investigation." *Strickland* v. *Washington*, supra, 466 U.S. 691. Moreover, and unlike with the previous four witnesses, nothing in the record points to any particular reasons that appear to have supported Polan's decisions not to investigate them.[6] However, we need not speculate why Polan might not have investigated Walker and Wright or determine whether such decision could be objectively reasonable despite the lack of support in the criminal trial record.

Irrespective of the performance prong, we conclude that the petitioner cannot satisfy the prejudice prong of the *Strickland* test with respect to these witnesses.

"Although a petitioner can succeed only if he satisfies both prongs [of the *Strickland* test], a reviewing court can find against a petitioner on either ground." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, supra, 330 Conn. 538. Considering the totality of the evidence before the jury, we cannot conclude that there is a reasonable probability that the result of the petitioner's criminal trial would have been different if Polan had called Walker or Wright to testify. See, e.g., *Ledbetter* v. *Commissioner of Correction*, supra, 275 Conn. 458. Regarding Walker, who was a close friend of the victim, we begin by noting that his testimony that the victim had a gun was duplicative of the testimony of the state's key eyewitness, Williams. In fact, Polan reasonably could have determined that Walker's testimony that the victim never actually drew his gun would have been less compelling for purposes of the petitioner's self-defense claim than Williams' testimony, given that Williams claimed that the victim actually drew his gun. *Jordan* v. *Commissioner of Correction*, supra, 197 Conn. App. 857–58; see also *Meletrich* v. *Commissioner of Correction*, 332 Conn. 615, 628, 212 A.3d 678 (2019). Additionally, although Walker's testimony would have supplied credible evidence by a hostile witness that the victim had a gun and was exhibiting threatening behavior toward the petitioner, his testimony also contained a crucial fact that would have undercut its persuasive effect. Specifically, Walker's testimony that he saw the victim " '*flashing*' " his gun; (emphasis added) *Jordan* v. *Commissioner of Correction*, supra, 857; would have contradicted the petitioner's criminal trial testimony that *he did not see* the victim's gun and did not know whether the victim actually had a gun. See id., 843. This testimony concerned the critical factual dispute of whether the petitioner reasonably believed that the victim was about to fire his gun at him, which was central to his self-defense claim. Because the petitioner's testimony and Walker's testimony on this critical fact were inconsistent, however, we cannot conclude that there is a reasonable probability that Walker's testimony would have altered the outcome of the criminal trial. Rather, there was a real possibility that the jury would have found the petitioner, Walker, or both less credible because of the discrepancy concerning this central issue.

Regarding Wright, his testimony would have supported the petitioner's self-defense claim only to the extent that the jury credited his testimony that the victim had a gun at the scene. However, this was consistent with testimony by the state's key eyewitness, Williams, that the victim drew his gun before the petitioner drew his. Id., 841. Given that Wright testified that he observed the shooting from such a distance, his testimony con-

tained little additional evidence that would have supported the petitioner's self-defense claim. He did not see any of the other witnesses around the victim, and he could not even identify the petitioner as the person with whom the victim was conversing. Moreover, at the criminal trial, Williams had identified Wright as the person who fired the initial gunshot. Id. Because of Williams' testimony at the criminal trial, coupled with Wright's habeas testimony regarding his distant observation of the shooting and his weak recall of the other individuals present, we cannot conclude that there is a reasonable probability that Wright's testimony would have altered the outcome of the criminal trial. In sum, to the extent that Polan performed deficiently by failing to call Walker or Wright, the effect of such failure is best characterized as "isolated"; *Strickland* v. *Washington*, supra, 466 U.S. 696; it did not have "a pervasive effect on the inferences to be drawn from the evidence"; id., 695–96; or "[alter] the entire evidentiary picture . . . ." Id., 696. Our confidence in the outcome is not undermined by Walker's or Wright's habeas testimony.

In sum, we conclude that Polan's failure to investigate Alexis and Jymisha was objectively reasonable. We likewise conclude that Polan's decisions not to call Audrey and Jones were objectively reasonable. We also conclude that, irrespective of Polan's performance, her failure to investigate or call Walker or Wright did not prejudice the petitioner. Consequently, the petitioner has not satisfied the *Strickland* test with respect to Polan's representation in connection with his self-defense claim.

### III

We next consider the petitioner's claim of ineffective assistance with respect to Polan's failure to raise a third-party culpability defense. Specifically, the petitioner contends that Polan's performance was constitutionally deficient because, as a result of her inadequate investigation and decisions not to call Jones and Walker, Polan unreasonably failed to raise a third-party culpability defense. The petitioner asserts that Jones' and Walker's testimony that Kelly fired his gun, combined with the testimony by the medical examiner regarding the leftward and upward path of the victim's bullet wound, supports a strong inference that the fatal gunshot was fired by Kelly, not the petitioner. The respondent disagrees, contending that Polan reasonably decided that it was "better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." *Harrington* v. *Richter*, supra, 562 U.S. 109. We agree with the respondent.

We first review the standards governing the third-party culpability defense. "It is well established that a defendant has a right to introduce evidence that indicates that someone other than the defendant committed the crime with which the defendant has been charged.

. . . The defendant must, however, present evidence that directly connects a third party to the crime. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused." (Internal quotation marks omitted.) *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 514, 964 A.2d 1186, cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009). "It is not ineffective assistance of counsel . . . to decline to pursue a [third-party] culpability defense when there is insufficient evidence to support that defense." Id., 515.

Polan did not request, and the criminal trial court did not provide, a third-party culpability jury instruction. *Jordan* v. *Commissioner of Correction*, supra, 197 Conn. App. 869. The criminal trial record, however, demonstrates that one of Polan's defense strategies was to highlight the reasonable doubt in the state's case by explaining to the jury, particularly on the basis of the forensic evidence presented by the medical examiner, that the bullet that killed the victim could not have been fired by the petitioner. Id. It is not unduly speculative to conclude that Polan might have determined that this was the better approach to a theory of third-party culpability because it would not have involved the more rigorous requirements a jury instruction on the defense would have imposed. See *Harrington* v. *Richter*, supra, 562 U.S. 109; see also *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 514 (defendant must directly connect third party to crime). Polan reasonably may have believed that the third-party culpability defense was weaker than the petitioner's self-defense claim because the state had strong evidence to counter a third-party culpability narrative. For example, all the witnesses testified that the victim did not fall to the ground until after the petitioner fired his gun, suggesting it was his shot, and not the first shot fired, that struck and killed the victim.[7] Thus, although not abandoning it completely, Polan chose not to make it more of a focus of her closing argument and risk confusing or alienating the jury. Moreover, third-party culpability was only one of several defense strategies Polan pursued. As we emphasized with respect to the petitioner's self-defense claim, Polan's decisions regarding which defense strategies to emphasize throughout the trial involved the exercise of her professional judgment and were not objectively unreasonable. See *Strickland* v. *Washington*, supra, 466 U.S. 689.

The petitioner nevertheless contends that this case is factually analogous to *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 502, in which we held that counsel's "decision not to present the [third-party] culpability defense fell below an objective standard of reasonableness, and, therefore, constituted deficient performance under the principles enunciated in *Strick-*

*land.*" Id., 520. The petitioner asserts that, as in *Bryant*, the credible and highly persuasive testimony of two of the habeas witnesses—one of whom was neutral, the other of whom was hostile—supported a third-party culpability defense. See id., 517. The petitioner further asserts that, as in *Bryant*, this testimony was "exceedingly important" because both cases involved "a credibility contest . . . ." (Internal quotation marks omitted.) Id., 518.

*Bryant* is distinguishable, however, because we noted in that case that the explanations offered by counsel for his decision not to call the third-party culpability witnesses were objectively unreasonable based on the governing law and the criminal trial record. Id., 521–22 and n.15. As divined from the criminal trial record in the present case, the strategic reason for Polan's decision not to pursue an express third-party culpability defense is much stronger than the reasons proffered by counsel in *Bryant*. In addition, the arguments raised by the petitioner regarding *Bryant* and third-party culpability emphasize the crucial nature of Jones' and Walker's testimony and the prejudicial effect of Polan's decision not to call them or to raise an express third-party culpability defense. Although these arguments inform the prejudice prong of the *Strickland* test, they do not address the performance prong or our conclusion that the criminal trial record supports Polan's reasonable decisions regarding which defense strategies to pursue throughout the trial. Accordingly, the petitioner has not satisfied the *Strickland* test with respect to Polan's representation in connection with his third-party culpability claim.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

* November 5, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] In addition, the petitioner was charged with carrying a pistol or revolver without a permit in violation of General Statutes § 29-35. *State* v. *Jordan*, supra, 117 Conn. App. 162. The jury found the petitioner guilty of this crime, and the trial court sentenced the petitioner to the maximum permitted sentence of five years of imprisonment, to run consecutively to the sentence imposed for the first degree manslaughter conviction. *Jordan* v. *Commissioner of Correction*, supra, 197 Conn. App. 824 n.1.

[2] The petitioner contends that the Appellate Court applied an incorrect standard by requiring him to negate all "*plausible*" reasons for Polan's actions, rather than the "possible" reasons for her actions. (Emphasis altered; internal quotation marks omitted.) Specifically, the petitioner asserts that possibility designates a quantitative assessment falling between probability and impossibility, whereas plausibility is a qualitative assessment of superficiality. We note, however, that the Appellate Court used those terms interchangeably throughout its opinion. See *Jordan* v. *Commissioner of Correction*, supra, 197 Conn. App. 856 ("[t]here are a number of plausible reasons" for Polan's actions); id., 869 ("there are a number of possible reasons" for Polan's actions). In addition, the United States Supreme Court also has used those terms interchangeably throughout its ineffective assistance jurisprudence. See, e.g., *Cullen* v. *Pinholster*, supra, 563 U.S. 196 (court must "affirmatively entertain the range of possible reasons" for counsel's actions (internal quotation marks omitted)); *Strickland* v. *Washington*, supra, 466 U.S. 690 (actions taken "after thorough investigation of law and facts relevant to plausible options" are objectively reasonable). For purposes of our disposition of this case, we eschew use of the term "plausibility" in

favor of the term "possibility."

[3] In concluding that the petitioner failed to satisfy the prejudice prong of the *Strickland* test with regard to the habeas witnesses' testimony that the victim had a gun, the Appellate Court emphasized that this evidence "would only be marginally relevant to the petitioner's self-defense claim because it was the reasonableness of the petitioner's subjective perception of the situation, as he saw it, not the perception of the other witnesses, that was relevant to the issue of self-defense. In other words, Polan did not need to demonstrate that the victim in fact had a gun, only that the petitioner reasonably believed [that he was] armed." (Emphasis omitted; internal quotation marks omitted.) *Jordan* v. *Commissioner of Correction*, supra, 197 Conn. 865. However, as the petitioner persuasively contends, the witnesses' testimony that the victim *actually* had a gun would have corroborated his *belief* that the victim had a gun, which would have been relevant to the reasonableness element of his self-defense claim. See, e.g., *State* v. *Saunders*, supra, 267 Conn. 373–74.

[4] The Appellate Court speculated that Polan knew the substance of Alexis' and Jymisha's anticipated testimony because Audrey "may have told Polan and O'Donnell . . . what they may have observed." *Jordan* v. *Commissioner of Correction*, supra, 197 Conn. App. 852. However, Audrey's habeas testimony did not indicate that she communicated such information to Polan or to her private investigator. We need not so speculate because the record supports our conclusion that Polan might have declined to learn the substance of Alexis' and Jymisha's testimony because of their young ages and family relation to the petitioner.

[5] The Appellate Court listed other "plausible" reasons why Polan might have decided not to call Jones that find no support in the criminal trial record. Specifically, the court reasoned that Jones "had a criminal record," although the habeas record contains no further details, and that Jones was a friend of the petitioner, which ignores her testimony that she was also a friend of the victim and that she was therefore a neutral witness. *Jordan* v. *Commissioner of Correction*, supra, 197 Conn. App. 856. As the petitioner notes, the court provided no basis in the criminal trial record for its inference that these were among the possible reasons Polan might have had. Given that there is an objectively reasonable, strategic basis for Polan's decision not to call Jones that finds substantial support in the criminal trial record, we need not speculate further.

[6] The Appellate Court speculated that Polan both knew the substance of Walker's testimony and determined that "she would have a better chance of persuading the jury by relying on the state's witnesses" because of factual inconsistencies between Walker's testimony and Williams' testimony. *Jordan* v. *Commissioner of Correction*, supra, 197 Conn. 858. This reasoning, however, appears to contradict Polan's emphasis of the factual inconsistencies in the testimony of the various eyewitness as part of her strategy to highlight the reasonable doubt in the state's case. See id., 845 ("Polan, attempting to capitalize on the inconsistent factual testimony of the state's own witnesses, began her closing argument by attempting to persuade the jury that there was reasonable doubt about what had occurred"); see also *Harrington* v. *Richter*, supra, 562 U.S. 109 (court should not "indulge post hoc rationalization for counsel's [decision-making] *that contradicts the available evidence of counsel's actions*" (emphasis added; internal quotation marks omitted)). Given that the petitioner's claim with respect to Walker's testimony fails on the prejudice prong of the *Strickland* test, we decline to speculate outside the record regarding why Polan did not investigate or call Walker.

[7] Additionally, as the Appellate Court explained, Stevenson, Williams and the petitioner himself testified at the criminal trial that the victim had begun to turn away from the petitioner at the time the petitioner fired his gun, which could have explained away the forensic evidence that was central to the success of any third-party culpability claim. See *Jordan* v. *Commissioner of Correction*, supra, 197 Conn. App. 870. This further supports the conclusion that Polan reasonably may have determined that it would not have been the strongest defense strategy to request a third-party culpability instruction.